Radcliff, J.
By the case, it appears that E. Seits, the mate of the vessel, was the only witness whose testimony, as delivered at the trial, went to prove that the loss happened on a direct voyage from Wilmington to Falmouth. In support of the opinion which I shall give, it will be material to show that no other evidence sufficient to establish the fact, that the loss happened on a direct voyage to Falmouth, was offered by the plaintiff, and that the deposition of this witness, contrasted with the other evidence in the cause, ought not to govern its decision.
The other evidence to prove the loss, and the circumstances attending it, is in these words: “That the course from Cape Fear, in North Carolina, to England, was usually east, till they passed the Gulf stream, and to New York was north east after passing Cape Hatteras ; that no vessel passed the Gulf stream in coming to New York; that the loss happened in lab 33° 51z and long. 74°, and if the wind had been favorable, a more northerly course wonld have been steered for London.”.
it does not appear from any "part of the testimony, that the vessel had entered or passed the Gulf stream, nor at what particular place the loss happened. The latitude and longitude, as given, cap furnish no satisfactory guide. The best calculations of longitude are known to be uncertain, and were they capable of certainty, it cannot be supposed, under the circumstances of this loss, occasioned by a tempest, that an accu. rate calculation could have been made. The vessel was the *230 sport of the winds, the captain and seven out of ten of the crew were drowned, and every consideration but that of personal safety must have been lost- in the common danger. From the course under such "circumstances, or the place to which the vessel was driven, if these were known* it cannot -be "ascertained whether she sailed from Wilmington directly for Falmouth, or for New York.
The proof of her actually sailingon a direct voyage to Fal - mouth (for I do not now speak of the previous intent) [*188] *is, therefore, confined to the mate. But on this point his testimony, at different periods is in direct hostility to itself. In his deposition read by the plaintiff, he swears that the vessel was on her direct voyage to Falmouth. In the protest produced on the part of the defendant, he swears that she sailed from Wilmington bound for New York. The meaning or force of terms, so opposite and contradictory, cannot be mistaken. According to common acceptation, and their obvious import, I think this witness stands self-convicted of a falsehood, contained either in his deposition or protest, and 1 adopt the principle, that a witness who deliberately contradicts himself, with respect to any fact, ought not to be credited, unless supported by other proof, to establish that fact in any way whatever. Testimony derived from so impure "a source, and'htanding alone, cannot be admitted. >
If we could suppose, as has been suggested, that this witness was- not aware of the force of the terms used in his deposition, and that he did not intend to testify to a direct but a circuitous Voyage to Falmouth, by the way of New York, his testimony might be reconciled. But rejecting this hypothesis, his deposition that the vessel was on her direct voyage to England, is not only contradicted by himself, but by “ one or more seamen,” who in the protest unite with him in swearing that she sailed from Wilmington bound for New York. These seamen stand unimpeached, and are strongly supported by the presumption arising from the three letters written by the plaintiff’s agent to the defendant, shortly before the vessel sailed, which successively state, the first, that the captain said he feared he should be obliged to *231 touch at the Hook for seamen ; the Second, that the captain had resolved to touch at New York for seamen, and the third, that the captain said he had cleared for New York.
In opposition to this, the plaintiff produced his instructions to the captain, directing him to Falmouth, the bills of lading signed by him, stating him bound for Falmouth, *and a letter from the consignee ■at Fal- [*189] mouth, acknowledging advice of the destination to that place. These documents show the original intent of á voyage to Falmouth, of which 1 have no doubt, but they do not show the performance of that, intent, nor that the voyage was actually undertaken for Falmouth. They relate to a period anterior to the commencement of the voyage, and, therefore, cannot impeach the positive testimony of the seamen, as to the subsequent destination. Nor are they at all inconsistent with the letters written by the plaintiff’s agent, the first of which was nearly two months subsequent in date to the instructions, and eight days subsequent to the bills of lading. The captain, between those dates, might from necessity, or for sufficient reasons, have changed his resolution, and sailed, as he said he had cleared, for New York.
From the whole of this evidence, therefore, (excluding that of the mate) I think it decisively appears, that the vessel actually sailed from Wilmington for New York, and that there was no testimony sufficient to warrant a verdict on the supposition that she sailed immediately for Falmouth. At least the evidence, if there be any to this effect that ought to be received, is so dubious and suspicious, that in a case of so much value, I think, it ought to be reconsidered, and the fact more fully ascertained. The jury may have been incautiously governed by the deposition of the mate, without adverting to its inconsistency, and. without giving effect to the other proofs in the cause.
From this examination of the evidence, I shall assume the fact to be, that the vessel sailed from Wilmington for New York, but no doubt with an intent subsequently to proceed to Falmouth.
With a view to the second question stated by the court, *232 (which I shall first dispose of,) it becomes then important, to-consider for what purpose she sailed for New York. - The . avowed .and only probable purpose was for seamen. [*190] The captain declared in two of his letters *that this was the object.- It is, therefore, necessarily to be inferred, that he had not a sufficient number of seamen engaged for the voyage to Falmouth, or that they had deserted,- or were not qualified for such a voyage. In either case, the policy was discharged; for every contract of insurance implies a warranty not only that the vessel is seaworthy,, but that she shall be duly equipped, and manned with a sufficient number of seamen of competent skill and abil ity to perform the voyage insured. (a) This point does not appear'to have been attended to at the trial, nor submitted to the jury,- and on this ground alone I think the present motion might be disposed of, and a new trial awarded.
But the more important .question, and which probably is-necessary to be decided in order to a. final determination of the cause, is, whether the voyage to Falmouth, by the way of New York, ought to be considered as a distinct voyage from the one described in the policy 1 If in determining this question we are free from the control of authority, it becomes interesting to establish a just and rational rule, consistent with itself, and which may- not lead to future embarrassment. If authority alone isjto govern, and some of the late decisions in England are deemed to apply and to .prescribe the rule, there can be no-use in further discussion. We must then puysue the beaten path, however-crooked it may be. I *233 entertain a high respect for the decisions of the English courts, but I do not feel myself, in'this instance, shackled by their authority. All the decisions in England which are supposed to touch the question,'have been inade subsequent to our revolution, except the two cases-briefly reported in Strange. Besides, this being a question of commercial concern, the determination of which can have no retrospective influence, nor affect pre-existing rights, 1 consider myself less restrained by the authority of existing cases. Should we implicitly follow precedents, on occasions like the present, we must hope for little improvement in our commercial code. A single decision, 'though founded oh [*191] mistake, would' become of binding force, and by repetition, error might be continued, or heaped on error, until the common sense of mankind, and the necessity of the case oblige us to return to first principles, and abandon precedents. These considerations, 1 think, are sufficient to authorize a freedom of opinion.
In the first place, to consider the question independent of authority.
The insurance, was from. Wilmington to Falmouth. The vessel, as I conceive the evidence to be, sailed from Wilmington bound for New York, in order to procure seamen for tile voyage to Falmouth. She Was lost before she came to the point of departure for New York. It has been argued, that there was only an intention to deviate, which not being cávried into effect, the insurers remain liable. I-admit that á mere intention to deviate will not vitiate a policy, but I cannot perceive how the just sense of this rule can apply to the present case. . Deviation is a relative, term. To constitute an actual deviation, the real voyage insured must have commenced, and there must be a subsequent departure.from that voyage. There can be no deviation from what does not exist. Did the voyage described in this policy or any part of it, ever exist? The voyage insured was from Wilmington direct to Falmouth. This direct voyage was never undertaken ; it never commenced; it had no existence; and of necessity there could be no deviation from it. If the course *234 in this instance, from Wilmington to New York had vaYied from the very port or wharf from which, the vessel sailed* could she with any propriety ;be said to have commenced her voyage to Falmouth, or to have deviated.from if? There could, then, clearly have been no inception.of the voyage to' Falmouth, and. of course no deviation. If so, can the acci-' dental circumstance of the Her being the same for a short distance, alter this case in principle, or essentially change the ’ character of the voyage ;■ I think not. It was still a separate and equally distinct voyage. If the voyage, then, [*192] • *was distinct, and there could he no deviation from it, there also could, be no intention to deviate. An intention to deviate from a voyage on which there was no-intention to sail, is a contradiction in terms.
The rule, therefore, that a mere intention to deviate, shall not vitiate a policy, can have no application to the case. Wherever that rule applies, whether the intention to deviate be óonceived before, or after the commencement of the. voyage, the real voyage insured has always been eritered upon, and at least partially performed. In the present case it was not performed; the voyage had no inception ; it did not exist. The risk,, therefore, never commenced, and the policy never attached.
This reasoning to-me,is satisfactory, and there is no authority of, decisive force and application to the question, to in-. duce me to adopt a different opinion. The first case which has been considered as maintaining a contrary position is that of Carter v. The Royal Exchange Insurance Company, (Marshall, 407 ; 2 Str. 1249,) and seems to have been the foundation óf some of the late determinations on this subject. “ The insurance was from Honduras to London, and a consignment to Amsterdam; a loss happened before the vessel came to the dividing point- of the, two voyages, which the insurer was held to pay for.”
This is the whole report of the case, and from the .naked facts uro'ar'e left in a great degree to conjecture the ground of its decision. It. is implied that the'vessel had actually sailed on the voyage insured. There w,as a consignment *235 id Amsterdam, but whether of the whole cargo, whether the rest of the ship’s papers were for Amsterdam or London, whether there was any other evidence of an intention to deviate, whether the captain had determined first to sail for the one place or for the other, does not certainly appear. Yet this seems till lately, to have been cited as the principal authority on the subject, in the English courts. It was determined at an early period, and I think is too loose and uncertain, to control our decision.
*The'next case is that of Foster v. Wilmer, (2 Str. [*193] 1249; 13 Geo. II. 1746,) which is connected in the same report with the last.
“ The insurance in that case was from Carolina to Lisbon, and at and from thence to Bristol. It appeared that the captain had taken in salt, which he was to deliver, at Falmouth, before he went to Bristol, but the ship was taken in the direct road to both places, and before she came to the point where she would turn off to Falmouth. And it was held that the insurer was liable, for-it is but an intention to deviate, and that was held not sufficient to- discharge the underwriter.’?
In this case the real voyage had actually cotñm'enced and had been partly performed from Carolina to Lisbon, and the captain intended to deviate on his way to Bristol.
He must have taken in the salt at Lisbon, and there, probably, first formed his intention to deviate.- In the case before us, the voyage insured had not commenced, and there could be no deviation, or intention to- deviate.
The next case is that of Bond v. Nutt, (Cowp. 601; Doug-344 ; S. C. 1777,) in which the argument of the court, in my opinion, supports the doctrine I have advanced. That was an insurance at and from Jamaica to London. The ship being completely laden for her voyage to London, sailed from St. Ann’s in Jamaica, to Bluefields, for a convoy Which lay ready there. The greater- part of the way was a different course from that to England. The court held that the going to Bluefields was neither a deviation nor-a distinct voyage, but a proper precaution in a state of war, for the in *236 terest of all concerned, and was, therefore, to be considered as part of the voyage from St. Ann’s to England. But they at the sanie timé declared, that If she had gone to Bluefields for any purpose Independent' of her-voyage to England, as for water or letters, or to wait in hopes of convoy, none being -ready, that would have given it - the condition of one voyage to Bluefields, and another from thence to England.
This reasoning is decidedly in favor of the defendant-inf the case before us, and shows that the voyage from [*194] Wilmington *tó .New York, for-the purpose of obtaining seamen,- cannot be considered as part of the-voyage to Falmouth. The object of procuring seamen at. New York, was as independent of the voyage, to Falmouth, as' the going for water, or letters, or to wait in hopes of convoy, would have been-at Bluefields, and gives it. as much the character of a distinct voyage.. ■ . •
The case of Wooldridge v. Boydell, (Doug. 16; 1778,) as far as it bears upon the question, I also consider in favor of the defendant, ' There the insurance was from .Maryland to Cadiz. The vessel was -captured in the Chesapeake,-on her.way to Europe, but it appeared that she never .intended to go- to Cadiz.- On- the argument, the two cases from Strange- above mentioned were cited, and it was contended, that there was a mere intention" to deviate. But the- court unanimously determined in favor of the underwriters, on the ground that although the vessel, was - taken before she arrived at the dividing point“ it was not the voyage intended, and not what they meant to insure.”
• The principle of the decision thus stated, instead of denying, rather supports the position 1 -maintain. . It is true Lord Mansfield sayS,. that in all the cases where .a mere intention to deviate, will not vitiate the -policy, the,, terminus a quo and ad quem, were certain and- the same. There the terminus ad quem, was" not the same,. 'The vessel had no intention to go to Cadiz.' But it does not follow that where the termini are the same,' (he voyage is always- the same, and'cannot be distinct. In the case of Way v. Modigliani, (2 Term, 30; 1787,) the termini, viere the .samé, and yet an *237 intermediate voyage to the Banks of, Ne wfoun dland, was held to be distinct. ■
The whole extent of the rule, as stated, by his lordship, and which appears to have led to some difficulty on the subject, is confined to this, that where the intention tó deviate will not vitiate, the termini must be the same. The criterion thus far, was proper, and applied to the case before him, was sufficient to decide it, but it does not serve to designate every case of a separate or distinct voyage, and I apprehend *the correct ground of the decision still was, as [*195] is expressed in the case, that “ it was not the voyage intended, and not what the underwriters meant to insure.”
In the case .of Way v. Modigliani, it will be sufficient further to state, that the same general position was confirmed. A part of the iter was the same, but the court, nevertheless, determined that the voyage was distinct, and that the policy never attached; and Mr. Justice Buller observed, in order that the policy may attach, “ the vessel must have sailed on the voyage insured, and not on any other.”
On the part of the plaintiff, the case of Kewley v. Ryan, (2 H. Bl. 343; 1794,) has been principally relied upon. In that case the termini of the voyage seem to have been the ground of decision. It Was an insurance from Grenada to Liverpool. The ship sailed from Grenada, bound for Liverpool, but with a design formed before the commencement of the voyage to touch at Cork, and she was lost before she came to the dividing point. The court in. delivering their opinion said, that where the termini were really the same, it was tó be considered as the same voyage, and a design to deviate not effected, would not vitiate the policy.
If the voyage insured in the present case, had really commenced when the vessel left Wilmington, and the purpose for which she sailed to New York, did not give it the character of a different voyage, I admit that this would be an authority on the side of the: plaintiff. But if I am right in considering the voyage as not being commenced, then the terminas a quo did not exist; then the vessel can never be considered as haying entered on the voyage described in the *238 policy. It is observable, that in the case just mentioned, the-counsel for the defendant stated another which had been tried before Lord Kenyon, at Guildhall in Hilary term, 1794, in which his lordship nonsuited the plaintiff in an.action on a policy on the same ship, being of opinion, that the case fell within the decisions.of Wooldridge v. Boydel, and Way v. Modigliani, above cited; and that there was no inception of the voyage. • Nothing more is to be found of the [*196] case, nor of the opinion of Lord *Kenyon, except what appears in Middlewood v. Blakes, (7 Term, 162; 1797,) in which all the authorities on the subject were adduced, and admitted to be law; but the cause was decided oh a ground wholly different, and his lordship intimated, that were this question res integra he might be of a different opinion.
If this: view of the cases on the subject be correct, I do not consider myself as opposing the whole current of the English decisions. Some of them I think I have shown plainly support the doctrine I maintain, and if others oppose it, they are of a recent date, and seem already to be regretted in their courts. With us it is fairly vexata questio, and the reason and principle of the case carry to my-mind, the fullest conviction, that the voyage from Wilmington to New York, notwithstanding the final destination to Falmouth, ought to-be deemed a distinct voyage from the one described in the -policy. Indeed it appears to me repugnant to common sense and scarcely possible to suppose, that either party ever imagined the voyage, to. Falmouth cóuld be construed to embrace, the one to New,York.
On this ground I am-also of opinion that a new trial ought to be granted. ' ■ •
Kent, J. The two material points are,.
1st. Was the voyage insured altered,- and was a new voyage to New York pursuing at the time of the loss ?
2d'. Was the vessel, when she sailed from Wilmington, competently equipped for the voyage tó Falmouth?
Upon the first point it appears to me evident from the-Case, that- the vessel when she sailed, took, her departure for Fal *239 mouth, as the ultimate place of destination, and that the port of New York was intended only to be touched at in the course of the voyage. The voyage originally in contemplation was for Falmouth, and the subsequent determination of the captain to touch at New York, did not arise from any new commercial speculation. It was not to take in new or additional cargo at New York, nor to sell, exchange, on divert the destination of the cargo *already re- [*197] ceived and consigned to Falmouth. It was simply to touch at the Hook or at New York for seamen. This was the only motive avowed, and the original intention of going to Falmouth with the same cargo, by the same party,' and under the same consignment, appears not to have been altered or abandoned.
This resolution of the captain to touch at New York, for the purpose declared, was not the substitution of a new voyage. It was the substitution only of an indirect instead of the direct iter or route to the ultimate place of destination.
The courts have gone a considerable length towards giving us a precise and definite criterion by which we can test the identity of a voyage. Where the terminus a quo, or commencement of the intended voyage, and the terminus ad quern or conclusion of it be the same with the termini of the voyage described in the policy, the voyage intended, and the voyage insured are the same, notwithstanding any proposed deviation, or the touching at any intermediate port, out of the usual and direct course of the voyage. The cases of Carter v. The Royal Exchange Insurance Company. (Str. 1249;) of Thelluson v. Ferguson, (Doug. 346;) of Kewley v. Ryan, (2 H. Blacks. 344;) and of Middlewood v. Blakes, (7 Term, 162;) have fully established these principles, and have put the question at rest in their courts.
It is not unusual, before the commencement of a voyage to contemplate deviations from the direct course for the sake of convenience, or for the attainment of objects incidental to the voyage. But to guard against the consequences of an actual deviation, it is customary to mention in the policy *240 the places out of the course, at which it is intended that the vessel shall have liberty to touch. In the present case there was no such liberty inserted in the policy, and had an actual deviation without necéssity taken place, from the usual and direct course from Falmouth, the defendant would have been discharged. No such actual deviation is pretended [*198] here. *The vessel foundered in a gale of wind the day after she left port; and if the testimony upon this point is to be credited, she was in the direct course to England. Considering, however, the distress and sudden loss,’ I incline to think that no permanent course, either to the one '’port or to the Other, had been taken.
I am accordingly of opinion with the verdict"on the first point, because there was no alteration of the voyage insured, and the determination of the captain to touch at New York, was "only an intended deviation.
The second point in the case is, whether the vessel w.as competently equipped for the voyage insured. This competency must consist not only in a sound vessel, but in ¿very thing requisite for the voyage, in a master of due skill, and in a sufficient crew.(a) (7 Term-, 160.) The intention of going to New York for seamen, is proof in the present case, that the vessel had not a sufficient crew. x And if we should give credit to the testimony of Seitz, the mate, (which is, however, so contradictory as to render it' of little weight,) and admit that the usual complement of seamen was on board, we must take it for granted that they were engaged only for New York, and that the captain could not, in that case, without a breach of faith, carry the vessel directly to England. He was under a moral inability to' go to Falmouth for want of seamen, and this was equivalent, in force and effect, to a physical incompetency to perform the-voyage. (Middleton v. Blakes, 7 Term, 160.)
On this second - point, therefore, I am of opinion that the. verdict is against the weight of evidence ; and when we take into consideration the amount of the sum in controversy, *241 and that this was not made a direct point upon the trial, I think there ought to be a new trial.
Benson, J. was of opinion that a new trial ought to be granted on both points, in which he concurred with Mr. Justice Radcliff.
*Lewis, J.
In the exercise of the power of grant- [*199] ing new trials, courts of justice, in my opinion, ought studiously to avoid the least infringement of the legal and constitutional rights of juries. To examine facts, and to determine the preponderancy of testimony, belongs exclusively to them, and it is not a sufficient reason, for setting aside a verdict, that the weight-' of evidence in the opinion of the court, was on the opposite side. There is a clear distinction in the books between verdicts against evidence, and such as are against the weight of evidence only, where there has been a contrariety of testimony. Not one instance, I believe, is to be met with, where the English courts have granted a new trial in a case of the latter description, unless where some additional strong ingredient has entered into the consideration of it, such as suspected fraud, perjury, or forgery, which there was good ground to believe, might upon a second trial be brought to light; or where the verdict has been in consequence of the misconception and misdirection of a judge, as was the case in Bond v. Nutt. (Doug. 352. Cowp. 601.) If the case under consideration shall, on examination, be found to fall within the above rule, unconnected with any such additional circumstances, and we are to be-governed by authority, no new trial ought to be granted.
To ascertain the fact, it will be necessary to examine the evidence as stated in the case. That, on the part of the plaintiff was; 1. The deposition of the mate, “ that the vessel foundered at sea in a gale of wind on the 7th September, 1797, on her direct voyage to England; that she was well manned and found, having ten hands on board; and the orders were to keep a due east course; that the captain and seven hands were drowned.”
2. The captain’s instructions from his owner dated 14th *242 July, 1797, directing him to go from North Carolina to Falmouth in England.
3. Invoices and bills of lading, dated 26th August, 1797, signed by the captain, for Falmouth in England. [*200] *4. Letter of John Ross, consignee of the cargo at
Falmouth, acknowledging the receipt of advice from North Carolina, of the consignment to him.
5. That the ship’s complement was ten hands.
6. That the course from Cape Fear, in North Carolina, to England, was nearly east till they passed the Gulf stream, and to New York, north-east, after passing Cape Halteras.
7. That the loss happened in lat. 33° 51' long. 74° and that had the wind been favorable, a more northerly course would have been steered for England; that no vessel crosses the Gulf stream coming to New York, and that the vessel was well repaired.
The testimony on the part of the defendant was: 1. A certificate from the officer of the customs at Wilmington, dated 3d January, 1798, that the vessel cleared for the port of New York.'
2. A protest of the mate and one or more seamen, made at Charleston, 28th September, 1797, stating the vessel to have sailed from Wilmington the 6th of the same month, bound for New York, and that she foundered the next day.
3. ' A letter to the plaintiff of the 28th August, 1797, from his agent, stating that he feared lest he should have to touch at the Hook.for seamen.
4. A letter from the same to the same, dated the day following, stating the captain’s resolution to touch at New York for seamen.
5. A letter from the same to the defendant, dated 3d January, 1798, stating that the captain said he had cleared for New. York.
6. That the vessel was built 13 years ago,
On this state .of the evidence, two questions of fact arose, which the judge reports were given in charge to the jury.
1. Was the vessel seaworthy 1
2. Was she on a different voyage when lost, from that stated *243 in the policies. And the judge directed the jury, that if they were of *opinion, either that she was not sea- [*201] worthy, or was not sailing on the voyage insured, when lost, their verdict must be for the defendant.
The seaworthiness of the vessel has not been contested. The second question alone furnishes the ground for the present application.
On the first argument it was contended in support of the motion, that the plaintiff ought to have shown with certainty, that the vessel sailed on the voyage insured, and if so, that she made no material deviation.
On the opposite side it was insisted that,1 admitting the captain’s intention of going to New York, it was only for an incidental accommodation, beneficial to all parties ; that at the least, Falmouth was the place of her ultimate destination, and having been lost previous to her arriving at the dividing point, it could amount to an intended deviation only which did not vitiate the policy.
On the second argument, a new position was assumed by the defendant’s counsel, that in every contract of insurance, there is an implied engagement on the part of the assured, that his vessel is in every respect competent to the voyage ; that from the clearance, the protest, and the captain’s declaration of his intention to go to New York for seamen, it was evident, such was not her situation,- and that, therefore, there was a deceit or concealment of a fact enhancing the risk, and a manifest breach of Contract on the part of the assured ; that there was a moral necessity for her going to New York, and that, therefore, it was a fair inference, that she was bound on a voyage different from the one insured, at the time of the loss.
To. this it was replied, that had the vessel gone to New York, and then to Falmouth, it would have been at most a x deviation ; that being lost before, she came to the dividing point, it could be only an intended deviation, and the case of Foster v. Wilmer was relied on; that there was, however, no evidence' of an actual intention to go to *New [*202] York. The ostensible motive was to procure seamen.
This was removed by the captain’s having .been able to pro *244 cure the necessary complement of men ; and that the jury must have been of that opinion.
From this view of the case, it appears that there was evidence on both sides ; that it rested altogether on matters of fact, which were explicitly submitted to the jury, who have decided oh them, and their decision, under the circumstances of the case, (there having been no misdirection of the judge) by the established rule of law, ought to be final.
But admitting the discretion of the court to extend to a case circumstanced like the present, the' question then results, is there sufficient evidence to warrant such a verdict ? There is great force in the observation, “that as the only motive for the captain’s intention of going to New York, was for seamen, and as he actually had his complement of men when he sailed, the inducement ceased,- and it is a fair presumption that the intention was laid aside. It is worthy of remark, that nine days intervened from the 28th August to the 6th September, between the captain’s declaration of his intention, and of his actual sailing. When the clearance was taken out we'do not know ; the jury who probably saw the documents, must have been better informed on this point, than we are. It is probable, however, that it was taken out on, or, perhaps, before the 28th August, in which case he would have had nine days at least, tó have completed his complement of men. The mate has declared that he had such complement; that seven of them were drowned, and the jury have believed him. But it is said they ought not to have believed him, on account of the supposed contradiction betweeen his affidavit and protest. They appear, however, to have found no great difficulty on this subject, nor do I perceive any. It is a rule of law, that apparent contradictions in testimony are to be reconciled if possible, for perjury is not to be presumed. If we attend to the objects of the two documents, the task of reconciling will be [*203] easy. That of the protest is merely in exculpation • of the master and mariners, by showing the time, place and manner of the loss. It is, like protests in many other cases, to exclude unfavorable conclusions. The voy *245 age to this effect being immaterial, the protest is made correspondent to the clearance ; but when the real destination of the vessel becomes the object of inquiry, and the mate is examined as a witness to that point, he declares according to the truth of the fact; that although she cleared for New York, she was in reality bound for Falmouth, and on her direct voyage thither. It is difficult to believe a perjury, without showing an inducement. Where is the inducement in the present instance 1 It does not appear that this man continued, after the loss of the vessel, in the employ of the plaintiff, and if we look for the means of dependance they will be found much greater in the hands of the body of merchants,composing the insurance company, than in those of a solitary individual. Besides, the plaintiff’s conduct precludes the idea of subornation, for the most important documents of the defendant, viz. the letters of the plaintiff from his agent must have been furnished by himself. Hence it appears to me, there was sufficient ground for the jury to believe, that the intention of going to New York was wholly abandoned.
But admitting that the mate intended to convey, and that the jury actually conceived, the idea that the vessel was on her direct voyage to England, though with the intention of touching at New York, it was for them to decide whether she was sailing on the voyage insured, or on a different voyage.
What constitutes a distinct voyage is always a question of fact, resting on the particular circumstances of the case, and is of course for the' decision of the jury, and so was the determination in Bond v. Nutt. To fix a criterion that shall determine, in all cases, between a contemplated deviation and a distinct voyage is difficult, if not impossible. This was attempted by one of the counsel on the *last argument, but there appeared to me much more [*204] of fancy and ingenuity in his physical and moral necessities, than of real solidity. His moral necessities fail-w-hen tested by the case of Foster v. Wilmer; and his physical, in every exemplification of them, amount to deviations esc justo, causa, which are always excusable. Intended de *246 viation finds no place under this distinction. In Foster v. Wilmer, the insurance was from Carolina to Lisbon, and at and from thence to Bristol. At Lisbon the captain took in salt for Falmouth ; the ship was taken before she reached the dividing point, and it was held an intentional deviation only. So in the case of Carter v. The Royal Exchange Insurance Company, the insurance was from Honduras to London and a consignment for Amsterdam, a loss happened as above, and the decision was the same.
In both these cases the deviation was intended previous to the ship’s leaving port. The moral necessity of touching at the intermediate ports existed in each, yet the court were of opinion, that it was the same voyage. If there is any general distinction, the only one which occurs to me is, where the vessel has an object in going to a different port, distinct from and independent of the voyage insured. In the present instance, if she was going to New York, it was not for a purpose distinct from the voyage to England ; it was for the purpose of procuring seamen for" that voyage. Falmouth was her place of ultimate destination, it was the terminus ad quern, and her going to New York could have been but a deviation.
In Bond v. Nutt, the insurance was at and from Jamaica to London, warranted to sail on or before the 1st day of August. The vessel sailed from St. Ann’s in Jamaica on the 26th day of July, for Bluefields in the same island, to join a convoy. She arrived there 'on the 28th, and was detained by an embargo till after the 1st August. One question was, did the policy ever attach, which depended on the fact, whether her departure for London, was her sailing from St. Ann’s or from Bluefields. .The other was, whether, if the [*205] voyage Commenced on her sailing *from St. Ann’s her deviation was ex justa causa, and excusable, or such as vacated the policy. The court decided that the voyage commenced on the vessel’s' leaving St. Ann’s, and of course that the policy attached ; and the "reason assigned is, that she left St. Ann’s with her cargo, papers, master, &c., on board, and did not go to Bluefields for any purpose indepen *247 dent of the voyage. So in the present case, if there was really an intention of going to New York, it was not for a purpose .independent of the voyage to Falmouth; but on the contrary, it was for a purpose connected with that voyage; she also had her cargo on board; all her documents, (the clearance excepted,) invoices, bills of lading, and consignment were for Falmouth. This then, was the place of her ultimate destination, and the intention of touching at New York, was at most a contemplated deviation. Thus, in every view in which this question is susceptible of being placed, I think the verdict right, and that it ought to stand. But it is principally on the ground that it was a question exclusively .for the jury, and that it was fully and properly submitted to them by the judge who tried the cause, that T found my opinion, that the defendant ought to take nothing by his motion.
Lansing, Ch. J. declared himself to be of the same opinion.
New trial granted.(a)

 In Lam v. Hollingsworth, 7 T. R. 160, Lord Kenyon said : “The assured cannot ■ recover on a policy -of assurance, unless they equip the ship with every thing necessary to her navigation during the voyage. The ship herself must be seaworthy; she must have a sufficient - crew, and a captain and pilot of competent skillor, as Mr. Baron Parke expresses it in Dixon v. Sadler, 5 M. & W. 414; S. C., 8 M. & W. 895, the vessel “ shall be in a fit state as to repairs, equipment and crew, and in all other respects to encounter the ordinary perils -of the voyage insured, at the time of sailing-upon it” See also, Philips v. Headlam, 2 Barn. & Adol. 383; McLanchan v. The Universal Ins. Co. 1 Peters, 183. ’ ••

 See page 190, n. (a)

 See remarks upon the question of seaworthiness, iri this case, 1 Phillips on Insurance, 2d ed. 312, 313; upon the question of deviation, id. 560, 561.