## Case No. 5,324.

### The GENTLEMAN.

[Olcott, 110.] [1]

District Court, S. D. New York. April, 1845.[2]

SHIPPING—DAMAGE TO PERISHABLE CARGO—SKILL AND COMPETENCY OF CREW—DELAYS—UNSEAWORTHINESS.

1. A ship is not answerable for damages to a perishable cargo occasioned by an unusually protracted voyage, unless the delay is owing to the fault of the master or owner.

2. That a voyage between particular ports is usually performed within a specified period of time, is not a circumstance which of itself imports culpable negligence, or want of skill, or competency in the crew of a vessel which occupies double that time in making it.

3. The fact that a cargo of raw hides, shipped in good order on the west coast of Africa the 2d of October, and transported to New-York in the hold of the vessel, unexposed to the atmosphere, arrived there the 18th of January following, injured by heat and worms, is competent evidence to prove the damage was caused by the long continuance of the voyage.

4. It is a breach of the warranty of seaworthiness for a vessel to leave her port of lading abroad, or any intermediate return port, with a crew inadequate to man or sail her.

5. The act is not justified if it be exceedingly difficult or even impossible to procure compe-

1 [Reported by Edward R. Olcott, Esq.]
2 [Reversed in Case No. 5,323.]

tent hands to man her. The obligation to supply a sufficient crew is absolute on the owner and master, and continues during the voyage.

[Cited in The Ethel, Case No. 4,540.]

6. An unusual procrastination of a voyage is not, in itself, evidence of incompetency in the crew to navigate the vessel, but it is admissible in corroboration of the opinion and judgment of witnesses that the crew was insufficient for the service.

7. The testimony of a crew to their own good health and bodily ability when they left port, is adequately rebutted by proof that they had been in the hospital sick with a malignant fever, and shortly after rejoining the ship had a relapse at sea, and became totally disabled to sail the vessel.

8. A cargo of raw hides is liable to speedy deterioration from worms and the confined heat of the vessel in a hot climate, but can be essentially protected from such injuries by being beaten or ventilated.

9. When a vessel so laden put into Cape de Verd Islands because of unseaworthiness, and was there detained thirty days for that cause, it was culpable negligence in the master not to use, during such detention, proper means for the preservation of her cargo.

[Cited in Speyer v. The Mary Belle Roberts, Case No. 13,240.]

10. When parties fix no time for the delivery of a cargo, the court will not adopt any supposed one as the proper time, nor, if the value of the cargo is found greater at such period than at that of its actual delivery, award the difference as damages to the shippers.

11. Quere, whether an action in rem will lie by shippers against a vessel to recover back an overpayment of freight made by them to the master.

This was an action in rem to recover damages for breach of a charter-party given in this port May 13, 1842, for one-half the vessel. The voyage agreed upon was "from the port of New-York to one or more ports on the west coast of Africa, and back to New-York direct, or via the Cape de Verd Islands." The vessel was to take out and bring back cargo, and be paid $400 per month for the voyage. The charter-party contained the usual stipulations that the owners should man and find the vessel, keep her in repair, &c. It is unnecessary, in considering the points in dispute in the cause, to detail minutely the course and incidents of the voyage. A succinct summary of facts will bring out all that is material to be stated. The libel makes numerous allegations, and the parties on both sides went into a wide range of proofs, neither of which are important to an understanding of the questions decided by the court. The vessel sailed from this port under this charter, June 13, 1842, with cargo belonging to the libellants on board, to be sold from the vessel. She touched at ports in the Cape de Verd Islands, where she disposed of part of her cargo. The remainder of it was sold on the coast of Africa, and she reached Gambia about the first week in September, ready to receive the home cargo. There was laden on board her, at that port, over 60,000 lbs. of hides, consigned to the libellants; and she made sail for this port with the cargo, October 2, 1842. She put into Buena Vista, in the Cape de Verd

Islands, on the 13th of October, on account of sickness of the crew, and their insufficiency to navigate the vessel, and for no other necessity of the ship or voyage. She remained there, for the same reason, until November 18th, when she left for New-York, but stopped the 19th at St. Jago, to obtain more hands, where one hand was procured from a Portuguese vessel; and the consul put on board her three to be taken home. So manned, she departed again for New-York, and arrived off this port January 4th, but was blown off by stress of weather, obtained a pilot, and put into Newport for shelter, and did not get into New-York until January 18th. The hides shipped at Gambia were greatly deteriorated by long confinement on board in a close hold, and by worms and otherwise. It appears, from the evidence, that a few days after the arrival of the vessel at Gambia, the crew were taken sick with the coast fever, and between the 15th and 24th of the month, all the men and both mates were removed from the vessel to the hospital. They left the hospital, and returned on board the 27th, 28th and 29th of September. They were very importunate to get back to the vessel, and were permitted to return against the opinion and advice of the physician. They were exceedingly reduced and enfeebled by the effects of the fever and confinement. There is testimony that the physician was of opinion they would experience a relapse of the disease if they attempted to work the ship. In the judgment of other witnesses, they were wholly unfit for the service. But the men themselves testify they were able to do duty, and it was also in evidence that the physician said the men had better go on board, and leave the coast, and that by proper care of themselves they might be in a better condition than to continue at Gambia. The cargo was put on board by natives of the coast, the crew being in the hospital, and disabled by sickness from assisting. One or two of the men experienced a return of the fever soon after leaving the coast, and all the crew were again attacked with it at sea, and became so exhausted and feeble that they were incapable of continuing the voyage. The master being taken sick, also, the vessel put into Buena Vista, because of the unfitness of the crew for service, and for that cause alone. It was proved that raw hides shipped from the coast usually begin to suffer injury from worms and close stowage in thirty days after laden on board; but if opportunity is afforded for doing it, they may be, in a good measure, preserved from serious damage, by opening the hold, and exposing them to the atmosphere, or by beating them. It was in evidence that the master opened the hold in Buena Vista, and became aware of the perishing condition of the hides. It was also proved that forty days was a customary and reasonable period for a voyage from the west coast of Africa to this port, at that season of the year, and in vessels of that class.

John Anthon and W. Emerson, for libellants. D. Lord, Jr., for claimant.

BETTS, District Judge. The libellants place their claim to damages in this action, substantially, upon two grounds: First, the procrastination of the voyage, by which the arrival of the vessel at her port of destination was retarded to the season notoriously sickly upon the coast, and beyond the proper period for shipping hides for this market, thereby exposing the crew and cargo to perils they would not have incurred had the run out been made within a reasonable time, and also delaying the arrival of the cargo in this port until the market for its sale had gone by; and, secondly, the taking of the cargo on board at Gambia, and leaving port with the vessel not in a seaworthy condition. In my opinion the first proposition does not, in the whole or any of its parts, rest upon a legal basis. It must be merely matter of hypothesis and conjecture whether the prolongation of a voyage is owing to the want of seamanship, diligence or judicious conduct in the officers or crew. So many natural causes control the event of voyages, that no law giving them proper directions can be deduced from experience, analogy or the intrinsic character of the employment. To render shipmasters or owners responsible for a matter in its nature so fortuitous, there must be connected with it some culpable act of omission or commission on their part. There has been no evidence produced in this case showing negligence or misconduct in the fitment or management of the vessel on her outward voyage, and it must, therefore, be regarded matter of chance whether the run was made in forty, or occupied seventy days, and was terminated at a healthy period best adapted to the business of the vessel, or extended to the known sickly season of the coast, and one most unfavorable to the objects of the voyage. The same observations apply to the passage of sixty days from Buena Vista to the port of discharge, with the consideration in favor of the last, that two men were lost at sea after leaving St. Jago. It is a common incident of navigation that vessels commencing voyages under circumstances equally favorable, in equipment and capacities of crew and vessels, at the same time vary in their despatch in proportion as large as the difference between forty days and the period of the outward or homeward run on this voyage; and in respect to the outward voyage in this case, there is no evidence of unusual delay with the vessel after reaching the Cape de Verd Islands, as she was then occupied in selling the cargo there and along the coast.

It appears to me that the libellants have established the responsibility of the ship for damages upon the other ground of complaint, both for the want of seaworthiness in the vessel, and culpable negligence of the master in keeping the cargo of hides confined below deck, whilst the vessel was lying at Buena Vista, from the 13th of October to the 18th of November, without ventilating or beating them, or using any precautions for preserving them from the perils of the climate, and those to which they were specially liable in their then condition. The owner was bound to keep his vessel seaworthy during the voyage, and it is a cardinal requisite to the fulfilment of the obligation, that she shall be furnished with an adequate number of persons of competent skill and ability to navigate her. Abb. Shipp. (Ed. 1829) 222; 3 Kent, Comm. 203–205, 287; Silva v. Low, 1 Johns. Cas. 184; M'Lanahan v. Universal Ins. Co., 1 Pet. [26 U. S.] 183; Taylor v. Lowell, 3 Mass. 331; Merchants' Ins. Co. v. Clapp, 11 Pick. 56. This responsibility does not apply to casualties occurring from sickness or accidents at sea which disable the crew; but it includes the condition of the ship when she leaves a foreign port, and especially her port of lading and departure with a home cargo, equally with that with which she enters upon the voyage. Putnam v. Wood, 3 Mass. 481; Kimball v. Tucker, 10 Mass. 192. The obligation is not discharged because it is found difficult or even impossible to procure a competent crew at the place. The ship assumes that risk abroad as well as at home. She would accordingly be chargeable to the same extent with a violation of her warranty, by sailing insufficiently manned homeward from a foreign port, as in entering upon a voyage at her home port, unseaworthy in that respect.

The evidence seems to me to leave no room for question that the vessel sailed from Gambia with a crew wholly inadequate to her safe navigation. The testimony of the men themselves, who manifest the most marked solicitude to prove their own good health and competency, leaves little room to doubt that they were at the time scarcely more than convalescing from the dangerous illness which they had endured, and were disqualified for undertaking the charge of the vessel at sea; and I consider it credibly proved, that the physician there gave the master to understand that as his opinion. The opinion of other witnesses that the crew were incompetent to man and sail the ship is corroborated by the immediate result of their undertaking to do it. Some of the men were taken down again with the fever four days after leaving Gambia river, and the whole crew went into Buena Vista, after being out thirteen days, sick and enfeebled to such a degree as to be unable to continue the voyage. The run from Gambia to the Cape de Verd Islands, with a crew sufficient to man and work her, would, it appears, ordinarily be made in three days. The ship was thirteen days in performing it, and although that fact, as before suggested, is not sufficient to charge the owners with dam-

ages alleged to be consequential to the delay and prolongation of the voyage, still it is a circumstance conducing to support the evidence to the incompetency of the crew to work the vessel at the time she sailed from Gambia. The ship having come into the Cape de Verd Islands from necessity, because of her unseaworthiness, the burden of proof is cast upon the owner to show that deficiency was removed when she departed, in continuation of her home voyage. In my opinion that fact is not satisfactorily established. It is quite evident, upon the proofs, that the whole thirty-three or thirty-four days detention at Buena Vista was required to restore the crew to a state fitting them to enter upon the voyage again, and that then they were inadequate to navigate the vessel alone. She stopped the next day at St. Jago to procure more hands, and the evidence no way clearly shows that the three consul's men, as they are called, obtained there, supplied the ship a competent crew for the voyage. Two months were consumed in getting her into this port, and six weeks in bringing her to the mouth of the harbor. But this additional retardation of the voyage is of less force as evidence of the insufficiency of the crew, because, in the course of it, two men were accidentally lost at sea; and the owner is not responsible for consequential damages arising from that event. In view of all the facts in evidence, however, I am of opinion that they establish a breach of the obligation of the owner to keep the ship seaworthy on her voyage. But I am not prepared to say he is, for that cause alone, chargeable with all the injuries sustained by the cargo. But I think the testimony fixes culpable negligence on the master in not taking proper measures at Buena Vista in ventilating the cargo at least, if not also having the hides beaten, to prevent the injurious action of the worms upon them. He was bound by law to take all possible care of the cargo during the course of the voyage (3 Kent, Comm. 213; Curt. Merch. Seam. 216; Abb. Shipp., Ed. 1829, 90, 132); and knowing his cargo was of a perishable nature, and had begun to deteriorate, it was incumbent on him to take proper precautions for its preservation, during the delay of the vessel at that port, especially as her detention was owing to his fault in failing to furnish her an adequate crew. It was suggested, on the argument, that the libel claimed no special damages because of a breach of the duty of the master in this respect. I do not remember that any exception was taken to the admission of evidence on that subject, and if it was, I am inclined to think the allegations of the libel are broad enough to comprehend all acts of non-feasance or misfeasance on the part of the master or owner in conducting the voyage, which tended directly to produce the injuries complained of. A portion of the hides received were damaged. That dam-

10FED.CAS.—13

age is at the risk of the shippers or underwriters, and is not to be regarded in this action. There is a difficulty in discriminating that damage clearly from the injuries caused by worms. But, in my judgment, the fair effect of the proofs is, that at least 25 per cent. of the loss is ascribable to the latter cause. I shall, accordingly, fix that as the rate of allowance to the libellants, and order a reference to ascertain the value upon which it is to be computed, disconnecting this injury from that by sea-damage.

The claim for compensation, because of the depressed state of the market when the hides were delivered, compared with its condition when it is supposed they ought to have arrived, rests upon inquiries and dates too speculative and vague to be made safely a ground for adjudging damages. No time was stipulated between the parties for the delivery of the cargo; and the period at which the market price is to be determined must, therefore, be fixed upon mere hypothesis and conjecture. A variation of a week or even a day as to the period to be the criterion of market value, might make most essential difference in the result. That demand is accordingly rejected. The libellants also claim a repayment of freight money alleged to have been overpaid to the vessel. This demand is not made a point of contestation in the pleadings, and it is at least doubtful whether, if clearly proved, such payment could be a lien upon the vessel, or that any remedy could be afforded the libellants in this action. I shall, therefore, reject that claim.

A decree will be entered for the libellants, and a reference be made to the clerk to compute the amount, upon the principles of this decision.

[Subsequently, on appeal to the circuit court, this decree was reversed. Case No. 5,323.]