THE AMERICAN INSURANCE COMPANY *vs.* OGDEN & M'COMB.

*Seaworthiness* is an implied warranty in a policy of insurance; it relates, however, only to the commencement of the risk—if it be then broken, the insurer is discharged from liability; but a breach of this warranty after the commencement of the risk, does not discharge the insurer from loss *subsequently* happening, *unless such loss be the consequence of unseaworthiness.*

It is not necessary that the injury to a vessel by the perils insured against should in all cases exceed *one half her value,* to justify an abandonment as for a total loss; the inability of the master to procure the necessary funds to make repairs is a valid cause of abandonment, although the vessel be in the port of *destination,* and not in an intermediate port or port of necessity. *Mr. Justice* BRONSON *dissenting.*

ERROR from the superior court of the city of New-York. This was an action on a policy of insurance on three fourths of a *schooner,* effected by Ogden and M'Comb, as the agents of the owner—loss payable to them. The policy was on *time* for six months from the 17th November, 1829—sum insured, $1800. The vessel sailed the 26th November, on a voyage from *New-York* to *Charleston,* from thence to *Norfolk,* and from thence to *St. Thomas,* in the West Indies. Whilst going into Charleston harbor and while the vessel was in charge of a pilot, the small *bower anchor* was lost on the outward bar. The schooner did not go up to the city, but discharged her cargo, which consisted of stone, about one and a half miles from the city. The vessel remained in the harbor five or six days; the pilot engaged to get up the anchor, but did not do so; and the wind being fair, the schooner sailed for *Norfolk,* where she arrived in safety. On her arrival there, the master made inquiries for an anchor, but could not procure one of a suitable size; those he saw were too *heavy* or too *light.* He remained at Norfolk nine or ten days, took in a cargo of shingles, and proceeded on his voyage to *St. Thomas* on the 7th January. Three days afterwards the schooner sprung a leak in consequence of a heavy cross sea, and in three days more she encountered a severe gale of wind with a heavy sea; her sails were split and the mainmast sprung, and the vessel became very leaky. She however succeeded in reaching *St.*

*Thomas* on the 25th January. The master, after making in-
quiries of mechanics, made an estimate that the vessel could
not be repaired and rendered seaworthy for less than $1700.
The cargo was discharged, and a survey was taken of the
vessel by three surveyors appointed by the U. S. consul, who
reported that the repairs might be made for $800 or $900.
The master was wholly destitute of funds; the consignees of
the cargo refused to make advances, the *freight* having been
previously drawn for, and they holding a protested draft for
the same; and money could not be obtained on *bottomry*, al-
though the master attempted to raise money in that way for
the purpose of making repairs. Under these circumstances
the vessel was sold at auction, and brought only the sum of
$388,32. The plaintiffs abandoned as for a *total loss*. The
insurance company offered to pay the *damage* as estimated by
the surveyors at St. Thomas; which offer the plaintiffs refus-
ed, and brought their suit. The counsel for the defendants
requested the judge to charge the jury, 1. That St. Thomas
being the port of destination, the inability of the master to
procure there the necessary funds for repairing the vessel was
not a sufficient ground of abandonment; 2. That the policy
being on time, the warranty of seaworthiness attached as a
condition precedent at the commencement of each voyage
during the period which it covered, and that it being admitted
that the vessel was unseaworthy from the want of an anchor
when she left Charleston and also when she left Norfolk, the
defendants were discharged from all subsequent perils; or if
the judge was of a different opinion, then that he should
charge that the evidence was not sufficient to excuse the
*laches* of the master in not recovering his anchor or obtaining
a new one at *Charleston*, and that therefore the defendants
were discharged from all subsequent liability; and 3. That if
the judge should be of opinion that the *laches* of the master
at Charleston were sufficiently excused, then that he should
charge the jury that it was the duty of the master, after his ar-
rival at *Norfolk*, if an anchor could not there be obtained, to
procure one from a neighboring port; and if the jury should
be of opinion that, by sending to Baltimore or New-York, or
any other neighboring port, the master could have obtained

UTICA,
July, 1836.

American Ins.
Company
v.
Ogden.

an anchor without an unreasonable delay of the voyage, then that the defendants were entitled to their verdict.   The judge charged the jury that the inability of the master to procure the necessary funds at St. Thomas was a valid cause of abandonment, and further instructed them that the vessel continued to be covered by the policy during the voyage, and that the plaintiffs were entitled to recover if the negligence and laches imputed to the master were sufficiently excused, and that the material question of fact on that point was whether the master made use of due diligence at Norfolk to obtain an anchor.   The defendants excepted to the charge.   The jury found a verdict for the plaintiffs for $2161, on which judgment was rendered.   The defendants sued out a writ of error.

*D. Lord, jun.*, for the plaintiffs in error, insisted that seaworthiness is a warranty ; and if it be not complied with, the insurer is discharged, whether the loss happen from a breach of that particular warranty, or from any other cause.   A misrepresentation avoids a policy ; so does a departure from the regular course of a voyage ; and a breach of warranty of seaworthiness should have the like effect. 1 *Phil. on Ins.* 117. 4 *Esp. N. P. R.* 25.   If an anchor could not be obtained at *Norfolk*, the vessel ought to have remained there until it could have been procured from some other place.   Secondly, he insisted that the want of funds or credit of the assured to obtain needful repairs at any of the ports of the voyage, as distinguished from ports of necessity or intermediate ports, is not a cause for abandonment, nor a peril assumed by the insurers.   The assured may abandon when the repairs will exceed one half the value, or if the vessel cannot be repaired without any fault on his part.   Here the assured was grossly in fault.   St. Thomas was one of the ports of the voyage, and not a port of necessity ; the master, if not supplied with funds, should have been furnished with the means of credit, instead whereof the very freight was hypothecated.   In *Van Buren* v. *Wilson*, 9 *Cowen*, 168, this court say, it is the duty of owners to furnish the masters of their vessels with the means of obtaining all the credit which the exigencies of the voyage may re-

quire. The mere want of funds can never be good cause of abandonment.

*S. P. Staples,* for the defendants in error, admitted that the vessel must be seaworthy at the commencement of the risk ; but contended that if she subsequently became unseaworthy, the insurer was not discharged, if the insured used due diligence in making the necessary repairs, or in again rendering her seaworthy. That the vessel in this case was unseaworthy at the commencement of the risk was not pretended on the trial, and the question of diligence to replace the lost anchor was submitted to the jury, who found upon this point for the plaintiffs, and their decision cannot be reviewed upon a writ of error. He admitted that every breach of an express warranty avoided a policy, but contended that a misrepresentation has not such effect, unless the damage which occurs grows out of the misrepresentation. A continuing implied warranty of seaworthiness is not a condition precedent, but in the nature of a misrepresentation, and unless the loss which occurs arises from unseaworthiness, the insurer is liable. The case of *Paddock* v. *The Franklin Insurance Company,* 11 *Pick.* 227, goes far to settle the question that the obligation of the assured to keep a vessel seaworthy does not operate as a condition precedent, but like a misrepresentation, where the insurer is not liable unless the damage grows out of the misrepresentation. In support of these propositions, he cited 1 *Manning & Ryland,* 673, 17 *Com. Law R.* 283, *S. C.,* 2 *Barn. & Ald.* 320, and *Hughes on Ins.* 269. He further contended that the master having used his best exertions to obtain money at St. Thomas to repair the vessel, and having failed to do so, was authorized to sell the vessel, and that the insurer was liable. In support of which position, he cited *The Patapsco Ins. Co.* v. *Southgate,* 5 *Peters' U. S. R.*604, 2 *Phil. on Ins.* 115, 7 *Wendell,* 84.

*By the Court,* SAVAGE, C. J. The points upon which the plaintiffs in error seek to reverse the judgment below are two : 1. That seaworthiness of the vessel is a warranty and condition of the contract of insurance ; and the breach of it dis-

charges the insurer from the time of its occurrence ; 2. That want of funds to make repairs is not a cause of abandonment.

There is no doubt that seaworthiness of the vessel insured is an implied warranty or condition. This condition is complied with, if the vessel insured is in a proper condition to carry the cargo actually on board, or intended to be put on board, when the insurance is made. It is sufficient that the vessel is in a fit condition for the voyage. There is no question but that the vessel in this case was seaworthy at the commencement of the voyage, and continued so until she lost her anchor. The warranty of seaworthiness relates to the beginning of the risk ; if it be broken at the commencement of the risk, the insurers are discharged from all liability ; but a breach of this warranty, subsequent to the commencement of the risk, does not discharge the insurers from the payment of antecedent losses ; nor does it from subsequent losses, unless the loss was the consequence of such unseaworthiness. This point was recently before the supreme court of Massachusetts, in *Paddock* v. *The Franklin Ins. Co.* 11 *Pick.* 227, where it was held to be the duty of the insured to keep the vessel seaworthy during the voyage, if in his power ; and if she is rendered otherwise, he is bound to supply the damage or loss, as soon as he conveniently can. If, in consequence of his neglect to do so, a loss ensues, the underwriter will not be liable ; but if the loss was not attributable to the neglect of the insured, the insurer is not discharged ; for instance, if the vessel sails without sufficient anchors, and is destroyed by lightning, the underwriters would not be discharged. In *Holdsworth* v. *Wise and others*, 1 *Manning & Ryland*, 673, 17 *Com. Law R.* 283, *S. C.*, the insurance was on a ship from Belfast to her port of delivery in British America and home. When she sailed from St. Andrews, New Brunswick, for Valentia, in Ireland, she was leaky, and made from eleven to twelve inches of water every two hours. It was contended that the warranty implied seaworthiness in the ship at every port from which she sailed in the course of the voyage ; but the court were unanimous in the opinion that the implied warranty of seaworthiness did not extend so far as to require seaworthiness at every port from which she might depart, in the course of the voyage.

These decisions are in accordance with reason and the general principles of insurance. See also *Weir* v. *Aberdeen,* 2 *Barn. & Ald.* 320. The fact, therefore, that the vessel in question was not properly supplied with anchors when she left *Norfolk,* cannot excuse the insurers, as the loss was sustained from an injury received by the winds and waves, while the vessel was at sea ; where it was totally immaterial, as to the injury, whether she had one or two anchors, or none at all.

The next point urged in behalf of the insurers is, that the want of funds wherewith to make repairs is not a good ground of abandonment. The contract of insurance is a contract of indemnity, and the policy of insurance is, in substance, a bond of indemnity. The consideration is called the premium, and the contract itself receives the name of a policy ; but the difference between a policy of insurance and a bond of indemnity is merely in name. Where the loss is only partial, the amount of such loss affords the indemnity ; where the whole subject insured is lost, the whole value must be paid, to indemnify the insured ; and in such cases the analogy between a policy of insurance and the bond of indemnity is perfect, with the exception that in partial losses the whole amount is not paid. But when the doctrine of a *technical total loss* is considered, the analogy fails. Where the loss is actually total, then the principle of indemnity requires payment of the whole loss ; but where the loss barely exceeds one-half, it may be difficult to perceive how the right to abandon and recover as for a total loss, was ever deduced from the obligation to indemnify. The right, however, is as perfect, under the construction which has long been given to policies of insurance to recover for a technical total loss, as for an actual total loss, or a partial loss. Mr. Justice Buller, in *Mitchell* v. *Edie,* 1 *T. R.* 608, and Lord Mansfield, in *Goss* v. *Withers,* 2 *Burr.* 683, have said, that the right of abandonment is one which ought not to be extended, and for the reason given, " for fear of letting in frauds." The cases in which the insured may abandon, and thereby turn that which is, in its nature, only a *partial loss,* into a *total* loss, are enumerated by some of the writers on this branch of the law. According to the *French* law, the right of abandon-.

ment is confined to five cases, to wit: capture, shipwreck, stranding, arrest of princes, or the entire loss of the subject insured. The latter case is explained to mean where there is an average loss or damage which exceeds half the value of the goods insured. 2 *Marshall*, 562. By the *new code*, other cases are admitted to exist. *Park* says, *page* 194, that an abandonment may be made, and the insurer held liable for a total loss, if the damage exceed half the value of the thing; or if the voyage be lost, or so interrupted that the pursuit of it is not worth the freight. In the case of *Peck* v. *The Merchants' Ins. Co.* 3 *Mason*, 65, Mr. Justice *Story*, after a very elaborate review of most, if not all the cases on this point, comes to the conclusion that the right of abandonment exists, 1. " Where there is a forcible dispossession or ouster of the owner of the ship, as in cases of capture; 2. Where there is a moral restraint or detention, which deprives the owner of the free use of the ship, as in case of embargoes, blockades and arrests by sovereign authority; 3. Where there is a present total loss of the physical possession and use of the ship, as in case of submersion; 4. Where there is a total loss of the ship for the voyage, as in case of shipwreck, so that the ship cannot be repaired for the voyage in the port where the disaster happens; and lastly, where the injury is so extensive that by reason of it the ship is useless, and yet the necessary repairs would exceed her present value." He further remarks: " If there be any general principle that pervades and governs them, it seems to be this.: that the right to abandon exists, whenever from the circumstances of the case, the ship, for all the useful purposes of a ship for the voyage, is for the present gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage is uncertain, or unreasonably distant, or the risk and expense are disproportioned to the expected benefit and objects of the voyage. In such a case the law deems the ship, though having a physical existence, as ceasing to exist for purposes of utility, and therefore subjects her to be treated as lost." The conclusion here drawn from the cases has received the approbation of Chancellor *Kent*. In his Commentaries, 3 *Kent*, 322, he says, " The conclusion is that the right of abandonment is to be

judged of by all the circumstances of each particular case, and that there is no general rule, that the injury to the ship by the perils insured against must, in all cases, exceed one half her value, to justify an abandonment." The case of the *Patapsco Ins. Co.* v. *Southgate and others*, 5 *Peters' R.* 604, exemplifies this principle. There the insurance was on the schooner Frances, from Curracoa, or a port of departure in the West Indies, or on the main to a port in the United States. On her voyage from Carthagena to Norfolk she received injuries which made it necessary for her to return to Carthagena; on entering that port she struck on a bar, and it was found that she required considerable repairs in her hull and rigging. She was placed under the care of the American consul at Carthagena, and was sold by him. On the argument of the case it was contended that no evidence was offered to show that the vessel was injured beyond half her value, and that only extreme necessity will justify a sale by the master. On the other hand it was contended that if a sale was necessary for the interest of all concerned, and if a discreet owner, under similar circumstances, would have sold the vessel, then the sale made by the captain was justifiable, and the plaintiffs had a right to abandon. Whether such necessity existed was a question of fact. The opinion of the court was delivered by Mr. Justice Thompson. He states that the court below had instructed the jury that if the vessel could not have been repaired without an expenditure exceeding half her value at the port of Carthagena, after such repairs, it constituted a total loss. " This direction," says the learned judge, " we think certainly correct." Upon the propriety of the sale he remarks, "As a general proposition, there can be no doubt that the injury to the vessel may be so great, and the necessity so urgent as to justify a sale. There must be this implied authority in the master, from the nature of the case. He, from necessity, becomes the agent of both parties, and is bound in good faith to act for the benefit of all concerned; and the underwriter must answer for the consequences, because it is within his contract of indemnity. He adds, that all the circumstances must be submitted to the jury, and they must find both the necessity and good faith of the master, in order to justify the sale.

UTICA,
July, 1836.

American Ins.
Company
v.
Ogden.

In the case under consideration, the counsel for the defendants below raised no question of fact for the jury upon the *bona fides* or the *discretion* of the master; they requested the presiding judge to charge, as matter of law, that St. Thomas being the port of destination, the inability of the master to procure there the necessary funds for repairing the vessel, supposing such inability to be proved, was not a sufficient ground of abandonment. The learned judge instructed the jury that the inability of the master to procure the necessary funds at St. Thomas was a valid cause of abandonment. This presents the point whether the inability to procure funds, in other words, the inability to repair the vessel, was a good cause of abandonment. For the purpose of deciding this question it must be admitted that this inability was real, and that the captain in making the sale acted for the benefit of all concerned. The omission to put any question to the jury is an admission both of the necessity and good faith of the transaction. These facts conceded, it seems to me to come precisely within the case of *The Patapsco Ins. Co.* v. *Southgate.* In the language of Mr. Justice Thompson in that case, "He," the master, "from necessity becomes the agent of both parties, and is bound in good faith to act for the benefit of all concerned; and the underwriter must answer for the consequences, because it is within his contract of indemnity." The circumstance of *St. Thomas* being the port of destination as to that particular voyage seems to have been thought of consequence: whether it would be so or not, I need not inquire, as the policy in this case was *on time,* and the time only half expired. Although it is true therefore that where the damage exceeds half the value of the vessel, the insured may abandon whether the master is furnished with funds or not; yet it is also true that the right to abandon does not in all cases depend upon the amount of damages: but as was said in *Peale* v. *The Merchants' Ins. Co.* the right exists in all cases where the ship is gone from the control of the insured; where the voyage is broken up; and, as in *The Patapsco Ins. Co.* v. *Southgate,* where a sale of the ship has become necessary for the interest of all concerned. This case falls within the latter class; the voyage was broken up, and that by a peril insured against;

the vessel was entirely useless without repairs ; and those repairs the master could not make for want of funds. But it was said that the owners were bound to furnish the masters of vessels with the means of obtaining all the credit which the exigencies of the voyage may require. 9 *Cowen*, 168. That was said *arguendo*, it must be remembered, in an action by a seaman against the owners to recover his wages, and not in an action between the assured and insurer upon the policy. In this case the master had all the means of acquiring credit which the control of the ship gave him, which in this action I think is sufficient. On the whole, therefore, the judgment of the superior court seems to be correct, and should be affirmed.

UTICA,
July, 1836.

AmericanIns.
Company
v.
Ogden.

———

The following *dissenting* opinion was delivered by Mr. *Justice* BRONSON.

I am unable to agree with my brethren in the opinion that there was any valid ground for the abandonment. The master estimated the expense of repairing the schooner at $1700, but according to the survey which he afterwards procured to be made, the repairs would not have cost above half that sum. The survey by competent persons specially appointed, rather than the opinion of the master, should govern in such a case ; but whichever may have been right, it was not pretended that the vessel had been damaged to half her value. She was in the port of destination. The master testified that he had no funds whatever on his arrival at *St. Thomas ;* that he had not even been supplied with money for the ordinary expenses of the voyage. He could not obtain money to make repairs from the consignee, and failed in an attempt to raise it on bottomry. Under these circumstances the insurers insisted that the mere want of funds to make repairs in the port of destination did not constitute a valid ground for abandoning: but the learned judge charged the jury " that the inability of the master to procure the necessary funds at *St. Thomas* was a valid cause of abandonment."

I cannot subscribe to this doctrine. The assured sends out the vessel without furnishing the master with a single dollar

to pay any necessary expenses; he has no credit with his correspondent, the consignee, nor with any one else residing at the place to which the vessel is sent; and he is still permitted to recover as for a total loss on the single ground of the inability of the master to procure the necessary funds to make repairs; and this too without reference to the extent of damage to the schooner in comparison with her value. Want of funds to repair damages has sometimes been taken into consideration in connexion with other circumstances; and in a port of *necessity* it may be an important if not a controlling fact. But no case was cited on the argument, and I think none can be found in the books, where the want of funds in the port of *destination* has of itself been held a sufficient ground of abandonment. The counsel for the assured referred to the case of *The Petapsco Ins. Co.* v. *Southgate*, 5 *Peters*, 604; but that case does not, I think, advance a single step towards supporting the decision of the superior court. As I read that case, there were three general questions: *first,* whether there was sufficient ground for abandoning; *second,* whether an abandonment had in fact been made; and *third,* whether there was such a necessity as would justify the sale which had been made of the vessel by the master. The two last questions have nothing to do with the case under consideration. In relation to the first, the circuit court of the district of Maryland gave the following instruction—"that if the jury find from the evidence, that *the damage* done to the schooner *Frances* by any perils of the sea on the voyage insured could not be repaired without an expenditure of money *to an amount exceeding half her value,* at the port of Carthagena, after such repairs, then *such damage* constitutes a total loss, and the plaintiffs are entitled to recover." The right to abandon and recover as for a total loss was expressly put upon the ground that the damage must exceed half the value of the vessel when repaired; a familiar and well settled doctrine. Whether the case had been made out in evidence or not was a question of fact for the jury, and if their verdict was not warranted by the evidence, it could not be reviewed on a writ of error. The discussion as to the right of abandonment was as to the place where the value of the vessel was to be ascertained; and the

court held it was the place where the injury happened. So far is this decision from supporting the doctrine for which the defendents in error contend, that the want of funds or the inability of the master to procure them is not so much as mentioned in the case; and the validity of the abandonment was distinctly placed upon another ground. Whether there was such a necessity as would justify the sale of the schooner by the master, was another and a distinct question, with which the court of review had nothing to do beyond the inquiry whether the law had been properly expounded to the jury ; and the facts upon which this question arose are not mentioned in the report.

I shall not go into an examination of the cases. If the decision of the judge on the trial does not rest upon the ground of authority, (and none was adduced on the argument,) it cannot, I think, be sustained upon any general principle applicable to the law of insurance. The contract of insurance is a contract of indemnity. The underwriter agrees that he will pay all such loss or damage as the assured may sustain by any of the perils to which the policy extends. There is nothing in the nature of the contract to warrant the doctrine of abandonment, by which the assured is permitted to turn a partial into a total loss ; and although that doctrine is now well established, the policy of its original introduction has been questioned by high authority, and it ought not, I think, to be extended beyond the cases in which it has already been allowed. Permitting the assured to abandon and recover as for a total loss, where the deterioration of the subject insured only exceeds by a fraction the half of its value, was going a great way ; and this rule, as was remarked by Chancellor *Lansing* in *Smith* v. *Bell*, 2 *Caines' Cas. in Er.* 157, originated " in the convenience of having a determinate and precise test in all cases, which, by its universality and uniformity, may render inquiries into minute objects, rather calculated to perplex than to elucidate, unnecessary."

What will be the practical effect of the rule laid down by the judge on the trial of this case ? It will open a wide door to fraud. The owner may send out his ship without funds and without credit, and then, for the want of some trifling

UTICA,
July, 1836.

AmericanIns.
Company
v.
Ogden.

sum of money, he may break up the adventure and turn the property over to the insurer ; and this, too, in the port of destination, where at least he ought to have either funds or credit, if not in other places. 9 *Cowen,* 168. Besides the danger of fraud, there will no longer be any " determinate and precise test " for the regulation of the right to abandon ; and there is much reason to apprehend that this doctrine will lead to interminable controversy. When may the assured abandon, and when is the insurer bound to accept the abandonment and pay as for a total loss ? When we depart from the settled rule on that subject, what amount of damage and consequent want of funds will warrant an abandonment ? If the damage need not amount to one half the value of the subject insured, must it be one third, or will a quarter or one tenth answer the purpose ? May the owner recover as for a total loss, because the master was unable to procure the necessary funds to supply the place of a lost anchor, or a chain cable ? The rule laid down on the trial sheds no light on these inquiries. It is no less important in commercial than in other pursuits, and the rights and the duties of parties should be as accurately defined as the nature of the case will permit. The merchant, on the one hand, should be able to ascertain with reasonable certainty the circumstances which will authorize him to call on the underwriter for the payment of a total loss ; and on the other, the insurer should know what is the extent of his liability. The amount of premium to be paid and received depends essentially upon this principle ; and beyond this, without abiding by well defined rules so far as they have been settled, and laying down others with equal accuracy wherever it is practicable, it cannot be expected that interested parties will be able to agree as to their respective rights and obligations. The consequences must be, that the courts will be called upon to adjust every loss, and the merchant will suffer all the inconvenience of awaiting the uncertain issue of a protracted litigation, before he can embark his capital in some new enterprize. I think the judgment of the superior court should be reversed.

Judgment affirmed.