## EDWIN R. HINCKLEY *vs.* GERMANIA FIRE INSURANCE COMPANY.

Barnstable.		March 4. — June 18, 1885.		W. ALLEN, COLBURN, & HOLMES, JJ., absent.

A license was duly granted to A. and B., under the Pub. Sts. c. 102, § 111, to keep a billiard or pool table or a bowling alley, for hire. B. had then retired from the business; and A., during the term of the license, obtained insurance in his own name upon the property. *Held*, in an action by A. upon the policy, that the license was valid.

If the owner of a bowling-alley and pool table has a license to keep the same, under the Pub. Sts. c. 102, § 111, at the time a policy of insurance against loss by fire upon the property used in his business is issued to him, the fact that, after the expiration of the license during the term of the policy, he uses the property, without a renewal of the license, for a short time, if not contemplated at the time of taking out the policy, will not of itself, and as matter of law, avoid the policy during the remainder of the term, and after the illegal use ceased, in the absence of evidence that the insurer was injuriously affected by such illegal use of the property after it had ceased.

A policy of insurance, in the form prescribed by the Pub. Sts. c. 119, § 139, against loss by fire upon property used in keeping a bowling alley and pool table, provided that "this policy shall be void . . . . if gunpowder or other articles subject to legal restriction shall be kept in quantities or manner different from those allowed or prescribed by law." The assured had a license, under the Pub. Sts. c. 102, § 111, at the time the policy was issued, which expired during the term of the policy; and he then used the insured property for a short time, without obtaining a renewal of his license. *Held*, in an action on the policy, that the temporary illegal use of the property did not prevent the policy from reviving after such use had ceased.

In an action on a policy of insurance against loss by fire, it appeared that the plaintiff in his proof of loss described himself as owner, and that his title to the property insured was by virtue of an instrument in writing by which he acknowledged to have received and hired the property of A., and for the use

of the property and as "rent" for the same had paid A. a certain sum, and agreed to pay him the balance in equal monthly instalments, on payment of which the property was to become the plaintiff's "absolute property;" that in case of failure to pay rent, A. had the right to take possession of the property, and the plaintiff agreed to return it. It further appeared that, at the time of executing this instrument, the plaintiff gave his promissory note to A. for the balance due; and that, after the loss by fire, A. brought an action against this plaintiff to recover the amount then due, but did not enter the writ in court. *Held*, that it could not be ruled, as matter of law, that the plaintiff was not the owner of the property.

A general statement of ownership by the assured in a policy of insurance against loss by fire, in the form prescribed by the Pub. Sts. c. 119, § 139, is a sufficient compliance with the requirement that, after a loss of the insured property, a statement in writing by the assured shall be rendered to the insurer, setting forth "the interest of the insured therein."

CONTRACT upon a policy of insurance, in the form prescribed by the Pub. Sts. *c.* 119, § 139, against loss by fire, for one year from March 15, 1883. The amounts and the property insured were as follows: "$500 on bowling alleys, balls, and pins; $300 on pool table, pool balls, and cues; $100 on saloon furniture and fixtures; $50 on stock in trade, chiefly cigars and ginger ale; all contained in the second story of Knapp's frame building, situate on the east side of Main Street, opposite Belmont Street, Brockton, Mass."

Trial in the Superior Court, before *Aldrich*, J., who reported the case for the determination of this court, in substance as follows:

It appeared that the property described in and insured by said policy was owned by Warren R. Spurr and Edward W. Spurr, until February 28, 1882, when they agreed to sell the same to Herbert A. and Edwin R. Hinckley, and received from Herbert A. Hinckley, who was the brother of the plaintiff, the following written instrument, signed and sealed by him.

" Know all men by these presents, that I, Herbert A. Hinckley of Barnstable, in the county of Barnstable, in the Commonwealth of Massachusetts, have received and hired of Warren R. Spurr and Edward W. Spurr of Brockton, in the county of Plymouth and Commonwealth aforesaid, the following described articles of furniture, namely: four bowling alleys; four sets of tenpins, bottle and straight; thirty-nine balls; one rifle gallery; two rifles and two targets; fifteen chairs; one pool table; sixteen pool balls; one clock; two show-cases; one counter; twelve cues

and cue racks; one ball rack; thirty lamps and fixtures; one large five-gallon oil can; pool table cloth and brush; and all other fixtures and implements whatsoever, including two stoves, in second story of the building owned by George L. Knapp, on the east side of Main Street, in said Brockton, used as a bowling alley.

" For the use of the above-mentioned articles, and as a rent for the same, I have this day paid to the said Warren R. Spurr and Edward W. Spurr the sum of two hundred and fifty dollars, and promise further to pay to them and their legal representatives the sum. of fifty dollars per month, (the first payment to be made on the 1st day of April next,) until such time as the sums so paid and to be paid by me shall amount to the sum of eleven hundred and twenty-five dollars, at which time said rent shall cease, and the said articles become my absolute property. But in case of failure to pay said rent as aforesaid, the said Warren R. Spurr or Edward W. Spurr may, without being deemed guilty of any trespass or tort, and without thereby rendering themselves liable to refund any sums received by them as rent as aforesaid, enter any house or place where said articles may be, and take possession of and remove said articles therefrom. And I further agree that, so long as said rent shall be payable as aforesaid, I will not injure, sell, mortgage, or relet the said articles, or remove the same from said building, and that in case of failure to pay the said rent, I will on demand return the said articles to the said Warren R. Spurr or Edward W. Spurr, or their legal representatives."

Said Herbert, at the same time, signed and delivered to the Spurrs a promissory note, dated February 28, 1882, by which he promised to pay them $875 in the manner following: " $50 thereof monthly, until said principal sum is fully paid, the first payment to be made on the first day of April next, with interest at six per cent per annum, payable monthly." The note also contained this clause: " This note is given to secure a furniture lease — instalments — between the parties hereto, of even date herewith, interest not as payment of the same." On the back of the note were indorsements of $50 and interest each month from April 1, 1882 to April 1, 1883, both inclusive. The Spurrs thereupon delivered said property to Herbert A. Hinckley and

the plaintiff, who at the same time paid the Spurrs the sum of $250 in cash.

The plaintiff also put in evidence two proofs of loss, in which he stated that he was the owner of the insured property.

The plaintiff further put in evidence tending to show that, after the fire hereinafter referred to, the Spurrs began an action against him to recover the amount due them on account of said property, by a trustee process, wherein the defendant was summoned as trustee, but that, after service on the trustee, said writ was abandoned and never entered in court.

The plaintiff called as a witness Warren R. Spurr, who testified, that he knew the property described in the policy, as he and his son, Edward W. Spurr, bought it from one Keith, about Christmas, 1881, for the sum of $1000; that about February 28, 1882, he and his son sold the property described in the policy to Herbert A. and Edwin R. Hinckley, by the furniture lease aforesaid, and that it was afterwards used by them; and that on or about said date he and his son received from Herbert A. Hinckley the written instrument and note above referred to; that since February 28, 1882, several payments had been made to him and his son upon the note, as shown by the indorsements thereon, all but two or three of which had been paid by the plaintiff, and that about $200 was due him and his son at the time of the fire, August 6, 1883; that he saw the fire, and saw afterwards, on the morning following the fire, on the premises occupied by the plaintiff, a partially burned fragment of the billiard table; that some time after February 28, 1882, (he could not tell exactly when,) he was present at a conversation between Herbert A. and Edwin R. Hinckley, when Herbert said he was sick, and that he wished to sell out his interest in the property, described in the furniture lease, to Edwin; that at the time of this talk there was an instalment of money due him and his son; and that, after Herbert said he was sick, Edwin asked him (Spurr) if he would give him time on the instalment then due, and he said he would.

The plaintiff testified as follows: " At the date of the policy I was the owner of the property described in and insured by the policy. I bought it from Herbert in June, 1882. Herbert said, in the first week of June, 1882, that he was sick, and wanted to

sell out the business to me. There was then an instalment due Spurr, and he was present at the conversation. I asked Spurr if he would give me time, and he said he would give me till the following Saturday. I paid Spurr the instalment then due, and Herbert had nothing to do with the property after this conversation, or with the place. I am sure the conversation took place during the first week of June, 1882. Herbert said he was sick, and had rather lose what he had put in than stay there, and said he did not suppose I would want to keep the place going, as I had outside business. I promised to save Herbert harmless from the note given to the Spurrs, and take the property off his hands and pay him what was right; and when we reckoned what he had drawn out, there was about $6 due him, and I paid him. I had possession and ran the business after that. When I last saw the property, on the Saturday before the fire, it was in Knapp's Block in Brockton. I ran the business there, from the first week of June, 1882, until the last week of June, 1883. A license was issued by the mayor and aldermen of Brockton, to Herbert and myself, on June 12, 1882. This license expired May 1, 1883. I applied for a new license in May, 1883, but none was issued to me. There was no playing of bowls, billiards, or pool there, after the last week of June, 1883, to my knowledge. I was not in Brockton when the fire took place, but was in Barnstable. There was some $175 and interest due the Spurrs upon the furniture lease and note, at the time of the fire. In the last week of June, 1883, I was notified that no license would be granted, and I closed my place. The police officer who notified me had not got to the bottom of the stairs before my place was closed, and I did no business in the place after that. My brother Herbert died in October, 1882. I paid the money to Herbert when I bought him out, on June 1, 2, or 3, 1882. I am sure I bought him out and made this payment during the first week of June, 1882. After the first week of June, 1882, I ran the place for hire, gain, or reward until the last week of June, 1883, when I stopped. Herbert had no interest in the place after the first week of June, 1882. Herbert had the lease. It was never transferred to me. I was not in Brockton at the time of the fire, but am told it occurred on August 6, 1883."

Edward W. Spurr testified that the property described in the policy of insurance, formerly belonged to his father and himself together, and was sold to Herbert A. and Edwin R. Hinckley; but the lease was made out in the name of Herbert.

The plaintiff then put in evidence a license from the mayor and aldermen of Brockton, dated June 12, 1882, authorizing Herbert A. Hinckley and Edwin R. Hinckley to keep four bowling alleys and one pool table on the second floor of Knapp's Building, in Brockton, until May 1, 1883.

The plaintiff admitted that from the first week in June, 1882, he ran the bowling alleys and the pool table and other property described in the policy, in connection with a shooting gallery in Knapp's Block in Brockton, for hire, gain, and reward; that he had no license for the keeping of said pool table and said bowling alleys for hire, gain or reward, except the license above referred to; and that for the period after May 1, 1883, he had no license whatever.

The plaintiff produced evidence which would warrant the jury in finding a total destruction by fire, on August 6, 1883, of the property insured, within the terms and meaning of the policy declared on.

The defendant offered no evidence, but at the conclusion of the plaintiff's evidence requested the presiding judge to rule that, upon the whole evidence, the plaintiff was not entitled to recover. The judge so ruled, and directed a verdict for the defendant.

If the ruling was correct, judgment was to be entered upon the verdict; otherwise, the verdict to be set aside and a new trial granted.

*J. M. Day & T. C. Day*, for the plaintiff.

*M. Williams & C. A. Williams*, for the defendant.

C. ALLEN, J. The report does not state the grounds upon which the ruling rested, that the plaintiff was not entitled to recover. The defendant, in its brief, relies on various objections, which we have considered.

In the first place, the defendant suggests that there is certainly great doubt whether the license, under which the plaintiff was doing business on the day when the policy was dated and delivered, was of any validity, since this license ran to both brothers, Edwin R. Hinckley and Herbert A. Hinckley, though

Herbert had ceased to have any interest in the place before the license was dated and issued. No authority is cited or reason assigned for so strict a construction; and we are of opinion that a license duly granted to two persons, under the Pub. Sts. c. 102, § 111, to keep a billiard or pool table, or a bowling alley, for hire, is available to each of them. This is not like a case where two persons seek to avail themselves of a license granted to only one of them.

It is then urged that, after the license had expired, the plaintiff kept the insured property in violation of law, from May 1, 1883, till the last week in June, 1883. The policy was dated March 15, 1883, and the license then existing expired on May 1, 1883. The fire occurred on August 6, 1883, and it was conceded that there was no illegal use of the property after the last week of the preceding June, at which time the plaintiff ascertained that his license would not be renewed. The defendant rests its objection on two grounds: first, that the illegality and criminality of the plaintiff's act in respect to the insured property vitiate the policy by operation of law, independently of any express provisions contained in the policy; and, secondly, that under a provision of the policy the right to recover is taken away. The authorities cited in support of the first proposition do not support it.

In *Kelly* v. *Home Ins. Co.* 97 Mass. 288, the policy was on intoxicating liquors, which, at the time of the insurance, and thereafter to the time of the loss, were intended for sale in violation of law. The policy never attached. There was never a moment when the liquors were not illegally kept; and all that the case decides is, that goods so kept at the time when the policy issued, or at the time of the loss, cannot be the subject of a valid insurance.

In *Johnson* v. *Union Ins. Co.* 127 Mass. 555, the facts were similar. The policy was on billiard tables, balls, cues, &c., kept without a license at the time the policy was issued, as well as at the time of the loss.

The ground of the decision in both the above cases is stated to be, "that the object of the assured in obtaining the policy was to make their illegal business safe and profitable, and that, the direct and immediate purpose of the contract of insurance

being to protect and encourage an unlawful traffic, the contract was illegal and void, and the policy never attached." The same facts existed in *Lawrence* v. *National Ins. Co.* 127 Mass. 557, n.

In *Cunard* v. *Hyde*, 2 El. & El. 1, the cargo which was the subject of insurance was partly loaded on deck, in violation of law, and while in that condition was totally lost.

In the present case, the plaintiff had a license at the time when the policy issued, and the policy therefore was valid when obtained. If it be assumed, without discussion, that the policy would cease to be operative during the time when the property was kept in use without a license, the question remains, whether such temporary illegal use of the property has the effect to avoid the policy altogether, or merely to suspend it during the continuance of such illegal use. There is nothing in the case to show that it was found, as a matter of fact, that the plaintiff, at the time of taking out the policy, intended to make it cover any illegal use of the property. He may have expected to get his license renewed; or, failing in that, he may have intended to close the place where the property was used, as, according to his own testimony, in point of fact he did. Under this state of facts, we are of opinion, that the temporary use of the property without a license, if uncontemplated at the time of taking out the policy, would not of itself, and as matter of law, render the policy void during the whole of the rest of the time which it was to run. If there were any special or peculiar reasons why such absolute invalidity should be declared, they should be made to appear. In the absence of such reasons, such temporary and uncontemplated illegal use of the property should not be visited with so severe a penalty as the absolute avoidance of the policy. It does not appear that the defendant was or could be in any way injuriously affected thereby, after such illegal use had ceased. It has the benefit of the temporary suspension of the risk, without any rebate of the premium. There is no hardship to the defendant in requiring it to show an actual injury, or else to avail itself of the clause in the policy giving the defendant a right to cancel it upon notice and a return of a ratable proportion of the premium.

There is no rule of law preventing the revival of a policy of insurance after a temporary suspension. " The doctrine that

the risk may be suspended and again revive without an express provision for the purpose, seems to be within the strictest juridical principles." 1 Phil. Ins. § 975. Accordingly, temporary unseaworthiness, if the ship has become seaworthy again, will not defeat the policy. 1 Phil. Ins. § 734. So as to other stipulations, as, for instance, that of neutral character and conduct. 1 Phil. Ins. § 975. And in *Worthington* v. *Bearse*, 12 Allen, 382, it was held, on great consideration, by this court, that, if the assured in a marine policy temporarily parts with his interest in the property insured, and afterwards buys it in again, the policy will revive, if there are no express provisions making it void, and there is no increase of risk. As between the insurer and the assured, there is no reason why the former should be allowed to avail himself of a temporary illegal use, like that which existed in the present case, unless it can also be shown that the subsequent risk was thereby increased, or the position of the insurer otherwise injuriously affected; and, as a matter of general policy, it does not seem reasonable to impose upon the assured so severe a consequence as the forfeiture of his policy, in addition to the penalty of one hundred dollars, which the Legislature has considered adequate as the maximum punishment for his offence against the public. Pub. Sts. *c.* 102, § 111.

It is further contended by the defendant, that, however it might be under the general rule of law, the policy contained a provision making it void. In the standard form of policy established by the Legislature, which was used in the present case, the matters avoiding a policy are enumerated. Omitting matters not here material, the provision is: " This policy shall be void . . . . if the insured shall make any attempt to defraud the company, either before or after the loss, — or if gunpowder or other articles subject to legal restriction shall be kept in quantities or manner different from those allowed or prescribed by law, — or if camphene, benzine, naphtha, or other chemical oils or burning fluids shall be kept or used by the insured on the premises insured, except that what is known as refined petroleum, kerosene, or coal-oil may be used for lighting."

In this Commonwealth, under the statutes for the regulation of trade, and providing for licenses and municipal regulations of police, there are a great many articles which, in a certain sense,

may be said to be "subject to legal restriction." Dogs, fish, nails, commercial fertilizers, hacks and horses in cities, may be referred to as examples. It may well be questioned whether, under the maxim *noscitur a sociis*, the clause in the policy above quoted ought not to be limited in its application to other articles of a character similar to gunpowder, the keeping of which may have a natural tendency to increase the risk. It would be rather a strained construction of this clause to hold that a policy should be void because an unlicensed dog was kept upon the premises; and yet such a dog, being subject to legal restriction, would be kept in a manner different from that allowed by law. It would not be sensible to give to these words the broadest construction of which they are susceptible.

But, irrespectively of this consideration, it is not the necessary meaning of the word "void," as used in policies of insurance, that it shall, under all circumstances, imply an absolute and permanent avoidance of a policy which has once begun to run; but the meaning of the word is sufficiently satisfied by reading it as void or inoperative for the time being. In Phil. Ins. § 975, it is said: "After it [the policy] has begun, so that the premium is become due, it surely is but equitable that a temporary non-compliance should have effect only during its continuance. To carry it further is to inflict a penalty upon the assured, and decree a gratuity to the insurer, who is thus permitted to retain the whole premium when he has merited but part of it. A forfeiture certainly ought not to be extended beyond the grounds on which it is incurred. . . . . And there does not appear to be any good reason why, in the absence of all fraud and of all prejudice to the underwriter, the same doctrine should not be applicable to express stipulations in the nature of warranties, or conditions, unless, by the circumstances or the express provisions of the policy, such application is excluded." In accordance with this doctrine, a provision in a policy that it should be void, and be surrendered to the directors of the company to be cancelled, in case of alienation of the property by sale or otherwise, was held to mean that it should be inoperative for the time being; and the assured, upon regaining title, after a sale of the property by him, was held entitled to recover. *Lane* v. *Maine Ins. Co.* 12 Maine, 44. So, where a policy provided that, " in case

of any transfer or termination of the interest of the insured, either by sale or otherwise, without such consent [i. e. of the company], this policy shall from thenceforth be void and of no effect," it was held that after such sale the policy revived upon the assured acquiring again the title, and holding it at the time of the fire. *Power* v. *Ocean Ins. Co.* 19 La. 28.

The same rule of construction has been applied to provisions against other insurance. *Obermeyer* v. *Globe Ins. Co.* 43 Mo. 573. *New England Ins. Co.* v. *Schettler*, 38 Ill. 166. *Mitchell* v. *Lycoming Ins. Co.* 51 Penn. St. 402. The court in Illinois has gone so far as to apply it also to a provision against an increase of risk, which ceased before the loss. *Schmidt* v. *Peoria Ins. Co.* 41 Ill. 295. *Ins. Co. of North America* v. *McDowell*, 50 Ill. 120, 129.

Without at present going beyond what is called for by the circumstances of the present case, we are of opinion that, assuming the temporary use of the property insured without a license to come within the prohibition of the policy, in the clause above quoted as to gunpowder or other articles subject to legal restriction, yet that clause is not to receive such a construction as to prevent the policy from reviving after such temporary use has ceased.

The only remaining objection urged by the defendant is, that the statements of loss rendered to it by the plaintiff were insufficient, in failing to state that the plaintiff had no legal title to the insured property, and that the Spurrs had an interest in it. But there is no finding, as matter of fact, that the plaintiff was not the owner of the property; and upon the report of the case, we cannot say, as matter of law, that it appears that he was not such owner. *Bailey* v. *Hervey*, 135 Mass. 172. *McCarthy* v. *Henderson*, 138 Mass. 310. Moreover, no attempt to defraud the defendant being found or charged, the provision of the policy, that a statement shall be rendered setting forth the interest of the insured therein, was sufficiently complied with. There was no provision calling for an exact statement of his title or interest, in detail, and a general statement of ownership was sufficient. *Fowle* v. *Springfield Ins. Co.* 122 Mass. 191.

*New trial granted.*