EDWIN SMITH, Respondent, *v.* NORTHWESTERN FIRE AND
MARINE INSURANCE COMPANY, Appellant.     (Two
cases.)

Insurance (marine) — contract — warranty — ships and ship-
ping — contract of marine insurance not vitiated by breach
of warranty where thereafter subsequent purchaser of vessel
is substituted as party insured — vessel unseaworthy which
sails without required complement of men — unseaworthiness
ceases upon arrival at pier — breach of warranty does not
avoid time contract of marine insurance where loss occurs
after defect has been corrected — voyage policy of insurance on
cargo — implied warranty that vessel is seaworthy — insurer
discharged by breach.

1. The arrest of a boat and her unseaworthy condition at the time
of the delivery of a binder calling for a time policy of marine insurance
on the hull, does not vitiate the contract of insurance, where, after
the vessel had been released and repaired, a subsequent purchaser
was substituted in the binder as the party insured. The warranties
of the new insured must be read as of the time his name was sub-
stituted. He did not take the risk of past breaches of warranty by
former owners but was answerable only for his own. And the con-
sequences of the substitution are the same whether the insurer acts
with notice of the former breach or without.

2. A vessel is unseaworthy which, at the inception of a voyage,
sails without the complement of men exacted by the statute, and an
argument that less than the number called for by the certificate of
the inspectors sufficed for navigation while the vessel was still within
the waters of the harbor, cannot be sustained. She is to start with
crew and equipment sufficient for the voyage. But the fact that she
is unseaworthy at the start does not mean that she is unseaworthy
when navigation has ceased and she is fastened at her pier. The
presence of the prescribed number of men is unnecessary when the
vessel is resting at her berth.

3. Under a time contract of marine insurance, wherein the insured
warrants that seaworthiness shall continue as long as the policy is in
force, the vessel being seaworthy at the inception of the risk, a
breach of the continuing warranty does not avoid the contract where
a loss occurs after the defect has been corrected. Upon such a breach
the obligation of the contract is suspended, if the risk has once

attached, and thereafter revives when the defect has been removed. Where, therefore, the vessel insured was seaworthy at the time the policy took effect and was seaworthy when destroyed by fire while lying at her pier, an intermediate breach of the warranty is unavailing to forfeit the insurance under the policy covering the vessel.

4. A voyage policy, however, insuring the cargo on the vessel, differs fundamentally from a time policy in the application of the law of warranties. Irrespective of any express warranty, the law implies a covenant in connection with a voyage policy that the vessel is in seaworthy condition for the necessities of the port, and seaworthy again for the necessities of the voyage when the time for sailing has arrived. Unless each of these implied warranties is satisfied, the insurer is discharged. Where, therefore, the vessel when it started was unseaworthy, the insurance on the cargo ceased to be effective at the moment of her sailing, and no recovery may be had thereon for a subsequent loss.

*Smith* v. *Northwestern Fire & Marine Ins. Co.*, 218 App. Div. 858, affirmed.

*Smith* v. *Northwestern Fire & Marine Ins. Co.*, 218 App. Div. 858, reversed.

(Argued October 12, 1927; decided November 22, 1927.)

APPEAL, in each of the above-entitled actions, from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered December 31, 1926, unanimously affirming a judgment in favor of plaintiff entered upon a verdict.

*William F. Purdy* and *Thomas A. McDonald* for appellant. On March 10, 1925, the *Traffic* was not " in safety " nor " free of capture, seizure, arrest," etc., as warranted by the hull insurance policy, which, therefore, did not attach. (Richards on Insurance [3d ed.], 594.) On March 10, 1925, the date of the hull binder, the *Traffic* was unseaworthy and the warranty of seaworthiness implied by law was breached. (*Van Wickle* v. *Mechanics' & Traders' Ins. Co.*, 97 N. Y. 350; *Wright* v. *Orient Mutual Ins. Co.*, 6 Bosw. 269; *Walsh* v. *Washington Ins. Co.*, 32 N. Y. 427; *Higgie* v. *American Lloyds*, 14 Fed. Rep. 143.) The *Traffic*, on setting out upon the voyage referred to in the certificate of insurance

on the cargo, was unseaworthy inasmuch as she was insufficiently crewed and equipped. (*Leitch* v. *Atlantic Mutual Ins. Co.*, 66 N. Y. 100; *Law* v. *Hollingsworth*, 7 T. R. 160.) At the time of the loss the *Traffic* did not have a competent watchman aboard. This constituted a breach of the warranty contained in each policy that the vessel should at all times when the vessel is loaded " have a competent watchman aboard." (*Gifford* v. *Patterson, Inc.*, 222 N. Y. 4; *Snyder* v. *Home Ins. Co.*, 133 Fed. Rep. 848; *Wheaton Packing Co.* v. *Ætna Ins. Co.*, 185 Fed. Rep. 108; *Cogswell* v. *Chubb*, 1 App. Div. 93; *Couch* v. *Farmers' Fire Ins. Co.*, 64 App. Div. 367; *De Hahn* v. *Hartley*, 1 T. R. 345; *Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 136; *Gaines* v. *Fidelity & Casualty Co.*, 188 N. Y. 411.)

*Thomas J. Brennan* for respondent. The claim that when the *Traffic* left New York she was unseaworthy inasmuch as she had an insufficient crew cannot be sustained. (*Louisville Ins. Co.* v. *Monarch*, 99 Ky. 578; *Warren* v. *Manufacturers Ins. Co.*, 13 Pick. [30 Mass.] 518; *Deshon* v. *Merchants Ins. Co.*, 11 Metc. [52 Mass.] 199; *Cunard* v. *Hyde*, E. B. & E. 670; *Redmond* v. *Smith*, 7 M. & G. 457; *Stuart* v. *Powell*, 1 Barn. & Adol. 266; *Phillips* v. *Headlam*, 2 Barn. & Adol. 380; *Flanigen* v. *Washington Ins. Co.*, 7 Penn. St. 306; *Keeler* v. *Firemen's Ins. Co.*, 3 Hill, 250; *Dixon* v. *Sadler*, 5 M. & W. 405; *Weir* v. *Aberdeen*, 2 B. & Ald. 320.) Whether the insured complied with the watchman clause was for the jury (*Manheim Ins. Co.* v. *Clarke & Co.*, 157 S. W. Rep. 291.)

Cardozo, Ch. J. The plaintiff in each of these actions is the assignee of the insured under a contract of marine insurance. One action is brought upon a binder covering a hull; the other action is brought upon a certificate covering a cargo. The facts as to each contract must be separately stated.

On March 7, 1925, Joseph F. O'Boyle agreed to sell his steam lighter, the *Traffic*, to Neptune Trading Company, which was to make a payment of cash and give a purchase-money mortgage. A bill of sale was signed but never delivered, the buyer refusing to complete the purchase. While the contract was still in force, application was made to the defendant for insurance on the hull. The binder, signed by the defendant on March 10, 1925, calls for a time policy in what is known as the inland form, with watchman's clause added. The insured is stated to be Neptune Trading Company, loss payable to O'Boyle, as mortgagee. The term of the insurance is stated to be from March 10, 1925, to March 10, 1926. The vessel is privileged to navigate the waters of the Port, Bays and Harbor of New York, East and North or Hudson rivers, and inland waters of New York and New Jersey, Long Island Sound, and waters as far east as Boston, Mass.

At the date of this binder, the *Traffic* was already beached in New London harbor with several feet of water in her hull. She had been arrested on March 9 by a United States revenue cutter and compelled to proceed to New London because of her unseaworthy condition. There she settled and sank. On being hauled to drydock she was partially repaired. Thereupon she received a temporary permit, allowing her to go to New York, where the repairs were to be completed. She was inspected by the underwriters on April 10, and then reported to be sound.

In the meantime the Neptune Trading Company had withdrawn from its bargain and rejected title to the boat. On April 9, 1925, O'Boyle made a new sale to Gurney, the plaintiff's assignor. This sale was reported to the defendant, which struck from the binder the name of the Neptune Trading Company, and substituted Gurney's, adding after his name the figures " 4 /9 /25," to indicate the date of change. A completed policy in the

inland form was made out to the new owner on April 23, 1925, though never, it seems, delivered.

We pass now to the application for insurance on the cargo. This application was made on April 24, 1925, in the name of Anthony O'Boyle, account of whom it might concern. The defendant thereupon issued its certificate of insurance covering a cargo of hardware on board the *Traffic*, subject to the clauses of the New York Lighterage form, " at and from New York to Boston."

The *Traffic* left New York for Boston on April 29, 1925. Her certificate of inspection, issued by the United States local inspectors under section 4463 of the United States Revised Statutes fixed the complement of the crew in case the vessel was operated not more than thirteen hours out of the twenty-four, and another complement when she was operated longer. In the one case she was to have one master and pilot, two able seamen, one chief engineer, one fireman, and one person in steward's and other departments when needed, a total of six men. In the other case, she was to have one master and pilot, one pilot, two able seamen, one chief engineer, one first assistant engineer, two firemen, and one person when needed in steward's and other departments, a total of nine. The *Traffic* set out on her voyage with only four men on board, a master, an engineer, a fireman, and a deckhand. She moored for the night at City Island, under orders to pick up a pilot in the morning and two other members of the crew, who were expected to come aboard. During the night the boat took fire, and with its cargo was destroyed.

The defense of breach of warranty set up in each of the two actions makes it necessary to quote some of the provisions of the policies.

The policy on the hull, following the so-called inland form, includes a warranty that the vessel is " free of capture, seizure, arrest, restraint, pre-emption or detain-

23

ment and the consequences thereof or any attempt thereat, and whether as an act of war or by civil authority or by any person or persons whatsoever, lawless or otherwise."

It also includes a warranty as to the condition of the vessel: " Warranted by the insured that the said vessel shall at all times during the continuance of this policy be tight and well found in anchors, cable, rigging, tackle and apparel, as is usual and customary; also in all other things and means necessary and proper for safe navigation according to the usage and custom; that she shall at all times have a competent watchman on board; and that whenever said vessel shall be at anchor in the nighttime she shall show one or more lights in a conspicuous place so as to warn and give notice to approaching vessels."

By another provision: " The watchman's warranty in this policy is in full force and effect, except that when this vessel is tied up or moored it shall be in charge of a competent watchman, but a breach of this warranty shall void this insurance only as to claims occurring during such breach or arising subsequently as a result of such breach."

By still another provision: " Any deviation beyond the limits named in this policy shall void this policy, but upon the return of said vessel within the limits named herein, this policy shall reattach and continue in full force and effect, but never beyond the date hereinbefore set for the termination of this policy, and provided only, no disaster has occurred during said deviation."

The cargo policy, following the New York lighterage form, omits the special provisions quoted from the policy on the hull, but contains the following warranty as to the condition of the vessel: " Warranted by the insured that the said lighter or vessel shall at all times during the continuance of this policy be tight, and well found in anchors, cable, rigging, tackle and apparel, as is usual and customary; also properly manned and equipped in

all other things and means necessary and proper for the safe navigation thereof, according to the usage and custom; and that whenever said lighter or vessel shall be at anchor in the nighttime, she shall show the proper lights as required by law, so as to warn and give notice to approaching vessels; and ˙that the said lighter and vessel, when loaded with cargo, shall at all times have a competent watchman on board."

(1) The defendant insists that the arrest of the boat and her unseaworthy condition at the delivery of the binder vitiates the contract for the insurance on the hull though the boat had been released and repaired when Gurney, plaintiff's assignor, was substituted in the binder as the party insured.

There is no doubt that the boat was under arrest on March 10, 1925, when the binder was delivered. There is none, we think, that at that time she was in an unseaworthy condition, though warranted to be tight and sound. We assume that for breach of these warranties the insurance would never have attached if the binder had not been changed. The binder, however, *was* changed by the substitution on April 9 of a new party to the contract. We think the warranties of Gurney, the new insured, must be read as of that time. He did not take the risk of past breaches of warranty by former owners of the vessel. He was answerable only for his own. The situation was the same in legal effect as if the company had issued a new binder or had noted upon the old one a waiver of any previous breach of warranty, known or unknown. There is no difference in that regard between policies of marine insurance and policies of insurance against fire. The common practice is, when property is sold, to substitute the name of the buyer without issuing another policy. Very likely, the insurance company loses something in premiums by this abbreviated form, since the first policy, if surrendered, would have been canceled at short rates. It gains, however, in convenience, and

often by securing a new customer who might otherwise go elsewhere. It must abide by its choice whether the result be gain or loss. Unquestionably the insurer will not be heard to insist upon earlier breaches if it accepts the new owner after notice of the cause of forfeiture (*Steen* v. *Niagara F. Ins. Co.,* 89 N. Y. 315; *Benninghoff* v. *Agricultural Ins. Co.,* 93 N. Y. 495, 506; *Shearman* v. *Niagara F. Ins. Co.,* 46 N. Y. 526; *Hooper* v. *Hudson River F. Ins. Co.,* 17 N. Y. 424). We think the consequence of substitution is the same whether it acts with notice or without. The result is a new contract between under-writer and owner. The insured may reasonably infer, in the absence of inquiry as to earlier grounds of forfeiture, that the insurer is indifferent as to their existence, and is content to make a fresh start as if a new policy were written. The fault is the insurer's if it chooses to approve the change without adequate inquiry (*Hooper* v. *Hudson River F. Ins. Co.,* 17 N. Y. 424, 426). Some of the cases put the stress of the argument upon the theory of a second contract independent of the first one. Others find in the situation the necessary elements of waiver or estoppel. Upon one ground or the other, and not infre-quently upon both, the insurer is charged with liability, whether the earlier causes of forfeiture were known or unknown (*Virginia-Carolina Chem. Co.* v. *Ins. Co.,* 108 Fed. Rep. 451, 456; *Ellis* v. *Ins. Co.,* 32 Fed. Rep. 646; *Fogg* v. *Ins. Co.,* 10 Cush. 345; *Bullman* v. *Ins. Co.,* 159 Mass. 118; Richards on Ins. p. 354, and cases cited). Any other conclusion would be at war with business practice, and with the beliefs and expectations which that practice has engendered.

(2) The defendant insists that the vessel was unsea-worthy at the inception of the voyage in that it sailed without the complement of men exacted by the statute, and that the result was a breach of warranty which forfeits the insurance on the hull and on the cargo.

We think the vessel sailed in an unseaworthy condition

(Arnould, Marine Ins. §§ 721, 723; 4 Joyce, Ins. §§ 2164, 2166; *Forshaw* v. *Chabert*, 1821, 3 Brod. & B. 158; *Silva* v. *Low*, 1799, 1 Johns. Cas. 184). She was without the complement of crew required by the statute. Such a vessel " shall not be navigated unless she shall have in her service and on board such complement of officers and crew as may in the judgment of the local inspectors who inspect the vessel be necessary for her safe navigation " (U. S. R. S. § 4463). The argument is made that less than the complement called for by the certificate of the inspectors sufficed for safe navigation while the vessel was still within the waters of the harbor. The judgment of a jury is thus to supplant the judgment of the public officers who have been charged with the duty of inquiry and decision. The terms of the warranty forbid this exchange of functions, if it might otherwise be proper. The vessel is to be manned with whatever means may be necessary for her safe navigation, " according to the usage and custom." We are not to assume that usage and custom would be satisfied with less than a compliance with the statute. She is to start with crew and equipment sufficient for the voyage (*Greenock S. S. Co.* v. *Maritime Ins. Co.*, L. R. 1903, 2 K. B. 657). But the problem is not exhausted when we find that the vessel was unseaworthy while navigating the waters between New York and City Island. The fact that she was unseaworthy then does not mean that she was unseaworthy when navigation had ceased and she was fastened at her pier. The prescribed complement of men must be aboard while the boat is on her way, but their presence is unnecessary when she is resting at her berth. Seaworthiness is a relative term (*Brick* v. *L. I. R. R. Co.*, 245 N. Y. 222, 226). What is essential for the voyage may be superfluous at port (Arnould, Marine Ins. § 687). Equipment must be adapted to the occasion and the risk. The boat was at her pier, and navigation was over, at the moment of the loss. She was not to go

farther on her voyage without replenishing her crew. She was seaworthy then, though unseaworthy before. We must say whether the policies were avoided altogether.

The insurance on the hull was a " time " policy, from March 10 or April 9, 1925, to March 10, 1926. The insurance on the cargo was a " voyage " policy " at and from New York to Boston." The two classes of insurance are governed by different rules. The effect of a deficient crew will be considered as to each.

(a) The English rule has long been that there is no implied warranty of seaworthiness under a time contract of insurance (Arnould, Ins. § 697; cf. Marine Ins. Act, 1906, § 39, subsec. 5). Many cases in the United States support a different holding, though the conflict of authority is such that the question may still be open (Joyce, Ins. vol. 4, § 2153; Richards, Ins. § 184; cf. *N. Y. & P. R. S. S. Co.* v. *Ætna Ins. Co.*, 204 Fed. Rep. 255, 258). There is no need to close it now, for in the policy at hand the warranty is express. A warranty of seaworthiness, unless otherwise extended, is satisfied, however, when seaworthiness exists at the inception of the risk (3 Kent Comm. 287; Arnould, Marine Ins. §§ 691, 692). If the insured suffers the vessel to become unseaworthy thereafter, this does not vitiate the policy unless the later condition was due to his neglect or other fault, nor even then unless a causal relation exists between the defect and the loss (*Union Ins. Co.* v. *Smith*, 124 U. S. 405, 427; *Am. Ins. Co.* v. *Ogden*, 15 Wend. 532; *Same* v. *Same*, 20 Wend. 287; *Paddock* v. *Franklin Ins. Co.*, 11 Pick. 227; *Peters* v. *Phœnix Ins. Co.*, 3 Serg. & Rawle, 25; 3 Kent Comm. 288; 4 Joyce, Ins. §§ 2174, 2175). His duty in so far as it relates to the future is not in a strict sense a warranty at all, unless he chooses to make it so (*Capen* v. *Washington Ins. Co.*, 12 Cush. 517, 540; *Dabney* v. *New Eng. M. Ins. Co.*, 14 Allen, 300, 305; *Am. Ins. Co.* v. *Ogden*, 20 Wend. 287, 304; 3 Kent Comm. [12th ed. by O. W. Holmes] p. 288, note; 4 Joyce,

Ins. § 2175). Though often characterized as a warranty it is in truth a duty to act according to the measure of his power. The law which creates it keeps it within limits of justice and reason. At the inception of the risk under the time policy of insurance (on April 9, 1925), the *Traffic* was seaworthy and the policy attached. There is nothing to show that at that time the particular voyage which began on April 29 was in any special sense within the contemplation of the parties. The policy was written, and the risk assumed, without reference to any voyage present or prospective, and this for three weeks before a voyage began (cf. *Gibson* v. *Small*, 1853, 4 H. L. Cas. 353, 390).

We have said that the warranty of seaworthiness is confined to the inception of the risk unless otherwise extended. The problem is complicated by the fact that an extension was accomplished here. The insured did not limit himself to a warranty of seaworthiness at the beginning of the term. He chose to add a warranty that seaworthiness would continue as long as the policy was in force. In respect of future happenings, he substituted an obligation absolute in terms for the obligation of diligent endeavor laid upon him by the law. We do not need to hold that reasonable construction might not affix some restrictions to the duty thus assumed with all its seeming generality. The question is not here, for example, whether such a covenant would be broken if seamen died at sea so as to reduce the crew below its complement (*Paddock* v. *Ins. Co.*, 11 Pick. 227, 233). Certain it is, however, that under a time policy so phrased, the duty must be absolute at the inception of each voyage, or whenever the vessel is at port about to sail anew (*Cogswell* v. *Chubb*, 1 App. Div. 93, 96; affd. on op. below, 157 N. Y. 709). The owner chose to warrant, and we must take him at his word.

The question remains whether breach of a promissory warranty that a vessel covered by a time policy shall

be kept in a seaworthy condition avoids the contract of insurance in case the loss occurs after the defect has been corrected. The rule is settled in the English courts that a warranty once broken puts an end to the insurance, irrespective of what follows, and this whether the warranty is affirmative or promissory (Arnould, Marine Ins. §§ 628, 688). "Where a warranty is broken, the assured cannot avail himself of the defense that the breach has been remedied, and the warranty complied with, before loss" (Marine Ins. Act, 1906, § 34). In this country the decisions are indecisive and conflicting (4 Joyce, Ins. § 2182; Richards, Ins. § 114). The effect of a breach of some warranties, though promissory in their nature, is to terminate the risk. This is so for example where there is a wrongful deviation, unless the policy contains a provision that the risk shall reattach when the deviation has ended (*Fernandez* v. *Great Western Ins. Co.*, 48 N. Y. 571; *Snyder* v. *Atlantic M. Ins. Co.*, 95 N. Y. 196; *Cogswell* v. *Chubb*, 1 App. Div. 93; 157 N. Y. 709; *Burgess* v. *Eq. Ins. Co.*, 126 Mass. 70). The effect of a breach of other warranties is merely to suspend the risk, or so at least it has been adjudged by courts of high authority (*Taylor* v. *Lowell*, 3 Mass. 331; *Paddock* v. *Franklin Ins. Co.*, 11 Pick. 227, 234; *Worthington* v. *Bearse*, 12 Allen, 382; *Hinckley* v. *Germania F. Ins. Co.*, 140 Mass. 38, 45; *Ring* v. *Ins. Co.*, 145 Mass. 426, 427 [per HOLMES, J.]; *Lapene & Ferre* v. *Sun Mut. Ins. Co.*, 8 La. Ann. 1; cf. *M'Lanahan* v. *Universal Ins. Co.*, 1 Pet. 170, 184; 1 Phillips on Ins. § 734; 3 Kent Comm. 289; 4 Joyce, Ins. § 2182). To determine which effect shall follow we must seek the intention of the parties (cf. 4 Joyce, Ins. § 2240; *Imperial F. Ins. Co.* v. *Coos Co.*, 151 U. S. 452, 467; *Mead* v. *N. W. Ins. Co.*, 7 N. Y. 530; *Ring* v. *Ins. Co.*, *supra; Kyte* v. *Commercial Union Ins. Co.*, 149 Mass. 116).

We think the intention of the parties must be presumed to be that under a warranty of seaworthiness continuing beyond the inception of the risk and during the whole of

many voyages, a supervening breach shall do no more than
suspend the obligation of the policy, and that the obli-
gation shall revive when the defect has been corrected
unless indeed there is an express provision that the effect
of any breach shall be to end the policy forever (cf.
*Imperial F. Ins. Co.* v. *Coos Co.,* 151 U. S. 452; *Mead* v. *N.
W. Ins. Co.,* supra, at p. 531). Nothing more than this is
the consequence of a breach of the continuing duty to
keep the vessel seaworthy imposed by the law itself in the
absence of a covenant, a duty often spoken of as growing
out of an implied warranty, though the description may be
lacking in technical precision. Indeed, the breach of the
implied warranty does not even suspend the risk in the
absence of a causal relation between breach and loss
(*Union Ins. Co.* v. *Smith,* 124 U. S.405, 427). We think
the parties had no intention, when substituting an express
warranty for the implied one, to invite such disparity of
consequences as would follow if every supervening breach
were to annul the policy forever. To impute such an
intention would be to lead to results almost shocking in their
hardship. A time policy for a year or longer may include
periods of idleness and then repeated voyages. There
may be seasons of closed navigation when the ship is at
her pier. There may be seasons of open navigation with
a voyage every day or oftener. If the breach of a con-
tinuing warranty that a vessel shall be seaworthy is to
put an end to the insurance and not merely to suspend it,
a defect developing upon the first voyage, though quickly
and permanently corrected, will avoid liability for a loss
upon the thousandth. The ship may have lost one of her
anchors at a time when two anchors were required (*Am.
Ins. Co.* v. *Ogden,* 15 Wend. 532; 20 Wend. 287). She
may have lost a member of her crew, deserting at a port
of stoppage. She may have sailed on her home voyage
with a temporary defect in her rigging or apparel, unknown
to the master. If such defects are remedied before the loss
occurs, the intention of the parties will be thwarted rather

than promoted, at least in the vast majority of cases, by a holding that the contract has been ended altogether. That conclusion is fortified when we consider the provisions of this policy as to the effect of deviation. By immemorial tradition, the duty not to deviate unless for sufficient cause is primary and basic. We find, however, that under this policy a breach so fundamental as deviation is not to end the contract, but that liability revives when the ship is again upon her course. One finds it hard to believe that penalties more drastic are to be visited on the owner for the temporary loss of a steward or an anchor. True, indeed, it is that the parties stated the consequences in the one situation and omitted to state them in the other. One may argue that the omission is a sign that the covenant not qualified was to be an absolute condition. More likely there was a tacit assumption that the consequences resulting from the breach of an express warranty to keep the vessel fit would bear some reasonable relation to those resulting from a breach of the warranty or quasi-warranty read into the policy by implication of the law. So we think they do, in the absence of the disclosure of a different intention. Upon a breach of the continuing warranty of seaworthiness the obligation of the contract is suspended, if the risk has once attached, and thereafter revives when the defect has been removed (*Deblois* v. *Ocean Ins. Co.,* 16 Pick. 303). Since the *Traffic* was seaworthy on April 9 when the policy took effect, and seaworthy on April 30, when destroyed by fire at City Island, the intermediate breach is unavailing to forfeit the insurance.

(b) We pass now to the consideration of the voyage policy, insuring the cargo on the lighter " at and from New York to Boston." Such a policy differs fundamentally from a time policy in the application of the law of warranties. Irrespective of any express warranty, the law implies a covenant in connection with a voyage policy that the vessel is in seaworthy condition at the

*terminus a quo* for the necessities of the port, and seaworthy again for the necessities of the voyage when the time for sailing has arrived (Arnould, Marine Ins. §§ 685-a, 687, 698, 699; *Merc. Ins. Co.* v. *Clapp,* 11 Pick. 56). Unless each of these implied warranties is satisfied, the insurer is discharged.

Thus, in *DeHahn* v. *Hartley* (1786, 1 T. R. 343; affd., 1787, 2 T. R. 186, n) a vessel was insured on a slaving voyage, " at and from Africa to her port or ports of discharge in the British West Indies," and a memorandum was inserted in the margin of the policy that the vessel had " sailed from Liverpool with fourteen six-pounders, swivels, small arms and fifty hands or upwards coppersheathed." It appeared that the ship had actually sailed from Liverpool with only forty-six men instead of fifty, but that within twelve hours of leaving Liverpool she had taken on board at Beaumaris six additional hands; and evidence was also given that the ship between Liverpool and Beaumaris was quite as safe with forty-six men as she would have been with fifty. The court unanimously held that the policy was void *in toto* (Arnould, Marine Ins. § 633). Again in *Forshaw* v. *Chabert* (1821, 3 Brod. & B. 158) a policy was effected on a voyage " at and from Cuba to Liverpool." The captain having lost some of his outward crew by sickness and desertion at Cuba, and finding it impossible there to engage ten men, his proper complement for Liverpool, sailed from Cuba with only eight men engaged for Liverpool, and two for Montego Bay (Jamaica), where he touched and landed the two men, and whence having procured others to supply their place, he proceeded on his voyage to Liverpool. The court held (*inter alia*) that the ship was not seaworthy when she sailed from Cuba for a voyage to Liverpool, as she ought then to have had on board a full complement of men engaged for the whole voyage (Arnould, Marine Ins. § 723). Again in *Queen Marine Ins. Co.* v. *Commercial Bank of Canada* (1870,

L. R. 3 P. C. 234) a vessel, covered by a voyage policy, left port with a defective boiler. She stopped at an intermediate port where the boiler was repaired. A loss occurred thereafter. The Judicial Committee of the Privy Council held, after a full review of the authorities, that the underwriters were discharged by force of the breach of warranty at the inception of the voyage.

There are suggestions in the books that the doctrine of suspension and revival may be applied even to a voyage policy if the vessel was seaworthy " at " the port, though unseaworthy when leaving port at the outset of the voyage (4 Joyce Ins. § 2182; Phillips, Ins. § 734). The weight of authority, however, makes the breach of the implied warranty equally definitive at one stage or the other. The primary purpose of a voyage policy is insurance of the risk during a voyage then in view. Whatever insurance attaches at the home port is incidental and preliminary. There can be little doubt that the reasonable expectations of the insurer are frustrated if the vessel starts on her voyage without suitable equipment. Of course, if the voyage consists of successive stages, the equipment at the outset does not have to be adapted to any stage except the first, though there is a duty in such circumstances when the second stage arrives to add or change as may be necessary (Arnould, Marine Ins. §§ 699, 700, 701; 4 Joyce, Ins. § 2171; *Greenock S. S. Co.* v. *Maritime Ins. Co.*, 1903, 2 K. B. 657). Here the vessel when it started was unseaworthy for the first stage of the adventure as well as for the others. That being so, the insurance ceased to be effective at the moment of her sailing. In such a situation the express warranty of fitness may be put aside as immaterial. So far as it departs from the implied one by imposing a continuing obligation after the voyage has begun, the consequences of the departure do not have to be considered, for there was a breach at the beginning. So far as the two are coincident, the results must be the same.

An express warranty does not exclude an implied one consistent with its terms (Arnould, Marine Ins. § 628; Marine Ins. Act of 1906, § 35).

The action on the cargo policy is subject also to the defense that proofs of loss were not submitted at the time or in the form prescribed.

The defendant makes the point with reference to both the policies that there was no watchman on the boat at the time of the fire. As to this there was a question of fact, which was answered by the verdict of the jury in favor of the plaintiff.

Our conclusion is that in the action on the policy covering the hull, the judgment should be affirmed, with costs to the respondent; in the action on the policy covering the cargo, the judgment of the Appellate Division and that of the Trial Term should be reversed, and the complaint dismissed, with costs to the appellant in all courts.

POUND, CRANE, ANDREWS, LEHMAN and O'BRIEN, JJ., concur; KELLOGG, J., not sitting.

Judgment accordingly.