## HARTFORD & NEW YORK TRANSP. CO. v. ROGERS & HUBBARD. CO.

## ROGERS & HUBBARD CO. v. HARTFORD & NEW YORK TRANSP. CO.

Nos. 3321, 3345.

District Court, D. Connecticut.

March 3, 1930.

Haight, Smith, Griffin & Deming, Wharton Poor, and James McKown, Jr., all of New York City, for Hartford & New York Transp. Co.

Single & Single and George W. R. Hughes, all of New York City, for Rogers & Hubbard Co.

THOMAS, District Judge.

This is an action brought by the Hartford & New York Transportation Company, as owner of barge No. 18, against the Rogers & Hubbard Company, as cargo owner, to recover general average of an agreed amount of $1,070.77. The damage resulted from the stranding of the barge at the mouth of the Connecticut river on April 16, 1926. Rogers & Hubbard Company has filed a cross-libel alleging unseaworthiness on the part of the libelant, and claims full damage for the loss of its cargo. The two cases were tried together and will be decided in one memorandum.

The tug Spartan, also owned by the Hartford & New York Transportation Company, left New York on April 15, 1926, with a tow of five barges and arrived at the mouth of the Connecticut river about 2 p. m. on April 16th. The tug and barges started to enter the channel, which at this point is about 300 feet wide, when they were caught in what Capt. Brewer termed a "witch" tide, produced by the combination of a 13-foot freshet coming out of the river, a strong ebb tide, and a southwesterly wind. The third and fourth barges in the tow touched bottom slightly, and directly thereafter the hawser attached to the fifth barge, No. 18, snapped, with the result that this barge was carried against the easterly breakwater and its cargo damaged.

I find from the evidence that the libelants used due diligence to make the tug and barges seaworthy, and that they were properly manned, equipped, and supplied, thereby allowing them to claim under the provisions of section 3 of the Harter Act, chapter 105, 27 Stat. 445 (46 USCA § 192). Sacramento Navigation Co. v. Salz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663. The certificate of inspection, which was produced in evidence, showed that the federal inspection was made on March 30, 1926, slightly more than two weeks before the accident. Cross-libelant has raised several points of unseaworthiness including (1) the failure to provide one able seaman aboard the tug, (2) a breach of Hell Gate regulations, (3) failure to observe storm warnings, (4) failure to have a helper tug at the mouth of the river, and (5) the poor condition of the hawser attached to barge No. 18. Assuming the truth of the first three points, they cannot be called, by any stretch of the imagination, the proximate cause of the accident. Nor is there occasion

to discuss the alleged shortage in the crew because one man more aboard the tug or barge could have done nothing toward preventing the accident. A violation of the Hell Gate regulations is a matter concerning the government alone, and the storm warnings posted on April 15th and not on the 16th—the date of the accident—are too remotely connected under the most favorable view of the evidence to have affected the situation here.

It is necessary that the alleged unseaworthiness be the proximate cause of the accident. In The Thessaloniki, 267 F. 67, decided by the Circuit Court of Appeals for the Second Circuit in 1920, a Greek ship by that name was lost at sea, and in a petition to limit liability it appeared that the boilers were defective with the knowledge and privity of the owner. It also appeared that the ship encountered very heavy weather and as a result took in water to such an extent that she was abandoned and sank. The District Court held that the boilers were unseaworthy, and the petition to limit liability was denied. The Circuit Court, reversing the decision of the court below, said that the perils of the sea were the real cause of the loss, and that, even though the boilers were defective, this condition did not cause the trouble and so held that the owner was entitled to limit liability. In The Malcolm Baxter, Jr., 277 U. S. 323, on page 331, 48 S. Ct. 516, 517, 72 L. Ed. 901, Mr. Justice Stone, speaking for the Court said: "Unseaworthiness alone, or deviation caused by it, displaces the contract of affreightment only in so far as damage is caused by the unseaworthiness."

In that case the court limited the amount of recoverable damage to such as was caused by unseaworthiness. It therefore is clear that, in order that cargo owners may recover, there must be a causal connection between the loss and the unseaworthiness. I do not attempt to distinguish the case of Smith v. Northwestern Insurance Co., 246 N. Y. 349, 159 N. E. 87, except to note that the action was upon the warranty of seaworthiness in an insurance policy and did not involve an interpretation of the Harter Act; and, further, that the decisions of the higher federal courts are binding here.

The most that can be said about the claim that the Spartan's captain should have arranged for a helper tug at the mouth of the river is that it was an error of navigation. Under normal conditions no help was necessary, and, if the captain of the tug had considered that, it was unsafe to proceed with five barges at this time he could have anchored part of the tow outside and gone back for them later. I am convinced that an "unlucky twist" of the tide caused the accident, and it was not one that could reasonably have been foreseen. The hawser was in good condition both from inspection and from the direct testimony that the ordinary life of such a hawser is at least twenty trips, and this trip was the thirteenth. I further find that there were two anchors aboard the barge and in such condition that the captain of the barge could have dropped both or either of them had his judgment so dictated, and for his failure to drop one or both of them I find no negligence under the circumstances.

I find that the bills of lading were actually issued. The direct testimony of two men that they signed the bills of lading which were produced in evidence is to be preferred over the understanding of a general average adjuster that no such bills had been issued. They contained the usual "Jason" clause providing for general average, and, since the amount has been agreed upon as $1,070.77, a decree for that amount in favor of libelant may be entered. The cross-libel is dismissed.

Submit decrees accordingly.