## IDEAL CEMENT CO. v. HOME INS. CO. THE VIRGINIA A et al.

## IDEAL CEMENT CO. v. McDONALD.

### Nos. 2439, 2445.

United States District Court
S. D. Alabama, S. D.
May 11, 1953.

Vickers & Thornton, J. Edward Thornton, Mobile, Ala., proctors for libelant.

Deutsch, Kerrigan & Stiles, Brunswick G. Deutsch, New Orleans, La., and Inge, Twitty, Armbrecht & Jackson, T. K. Jackson, Jr., Mobile, Ala., proctors for respondent Home Ins. Co.

Pillans, Reams, Tappan, Wood & Roberts, Palmer Pillans, Mobile, Ala., proctors for Sam A. McDonald and claimant of the tug, Virginia A.

THOMAS, District Judge.

Libelant brought a libel *in personam* (No. 2439) against the hull underwriters of its

Barge 105 to recover for the loss sustained in the sinking, raising and repairing of the vessel. Under the 56th Admiralty Rule of the Supreme Court of the United States, 28 U.S.C.A., the underwriters impleaded the Tug Virginia A which had towed the barge, and her owner, Sam A. McDonald. Libelant also filed a libel *in personam* (No. 2445) against McDonald, in which it alleged negligent towage. The two actions were consolidated for purposes of trial and judgment.

The issues of fact and law having come on to be heard on the pleadings and proofs of the parties and due deliberation having been had, the court now makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Libelant owned the flatdeck, riveted steel Barge 105 at the time of her sinking and employed her to transport clay from its pit at Buck's Crossing on the Mobile River to its cement plant at Mobile, Alabama. The Barge 105 has a length of 100 feet, beam of 30 feet and depth of 7 feet. The vessel is divided into six compartments: Forward and after rake tanks are separated from the main compartments by transverse bulkheads. One longitudinal bulkhead and another transverse bulkhead divide the remaining space into four main compartments. The bulkheads, at least at the deckline, were not watertight. The date, place of construction, and the name of her builder are unknown.

2. On October 9, 1947, The City of New York Insurance Company issued its policy No. H–2525 insuring the hull of Barge 105 against certain marine risks. Subsequently thereto that company was merged with respondent, The Home Insurance Company of New York, which has appeared and defended in the place and stead of The City of New York Insurance Company. The barge sank in the Mobile River during the term of the policy.

3. Under a towage contract existing between libelant and Sam A. McDonald, respondent in No. 2445 and respondent-impleaded in No. 2439, the former furnished Barge 105 for the movement of clay, while the latter provided the Tug Virginia A. During the term of this contract the barge sank on January 29 or 30, 1948.

4. Clay was discharged at libelant's plant by a mobile P & H crane, equipped with a standard 3-section 80-foot boom, fabricated of structural steel, weighing slightly more than three tons. The boom was fitted with a steel clam-shell bucket. The barge was customarily unloaded from its upstream end, with the clay being removed down to the deckline as the crane operator worked from bow to stern. In the usual course of discharge the bucket frequently came in contact with the steel deck. This caused holes and ruptures in the deck plating.

5. After about two months' use, the barge required repairs. In mid-December 1947, a shipyard, among other things, welded up cracks in both after corners and across the sternlog plate, 108 patch plates on deck, and 55 fractures in the deck plating. Watertightness of the rake compartments was tested only with a hose. Neither compartment was pressed up or tested with compressed air.

6. After the barge returned to service, other ruptures and holes developed in the deck. Reports of these conditions were made by the tug captain to the tug owner, who informed libelant accordingly. However, clay was then much in demand at libelant's plant. The barge was not withdrawn from service to effect repairs. All holes and ruptures in the deck were not made tight, though libelant from time to time did have its own welders repair some of the holes and ruptures in the deck.

7. On January 28, 1948, during discharge, when cargo was half unloaded, the port topping lift of the P & H crane carried away; the clam-shell bucket dropped some 10 feet onto the clay and rolled into the river; and the steel boom, weighing in excess of three tons, fell onto the cargo and extended across the barge. Discharge was not completed until early on January 29, 1948. Respondent, The Home Insurance Company, was not notified of this accident until long after the Barge 105

sank. The falling of this boom did not in my opinion have anything to do with the subsequent sinking, and did not increase the risk of loss under the policy.

8. The Tug Virginia A took the barge in tow on January 29, 1948, bound for Buck's Crossing. During the voyage upstream, soundings were taken in the tanks and no unusual amount of water found therein. The voyage terminated without incident. At Buck's Crossing some 350 tons of clay were loaded on deck to a height of 6 to 8 feet. The barge was trimmed down by the stern so that the lower edge of the sternlog plate was brought down to the surface of the water.

9. The voyage downriver was without incident until the barge was found to be settling by the stern. Inspection of the after rake compartment revealed that water was entering through an opening near the starboard corner between the lower edge of the sternlog plate and the rake plates. Efforts to staunch the leak and to pump out the water were unsuccessful. After a time, the barge was pushed into the right descending bank about one-half or three-fourths of a mile below Big Bayou Canot, at a point where the bank was too steep to beach the vessel. At that time the sternlog was level with the water.

10. The tow was moored to a tree with two lines. The tug stood for about two hours, by which time the barge's stern was submerged. The Virginia A then departed to report the incident at Mobile, leaving Barge 105 unattended.

11. Subsequent events indicate that after the stern rake compartment was flooded, water then entered the adjacent compartments over and around the rake bulkhead which was not watertight, and also through leaks and ruptures in the deck. Water continued so to enter the hull until the vessel lost buoyancy and the Barge 105 then foundered.

12. The barge could not be found when the tug returned the following morning. Later, divers located the vessel sunk in some 24 feet of water. When salvage operations began, cargo was removed from on deck. Efforts were made to raise the barge by blowing out the water from her compartments with compressed air, but there were so many leaks and openings in the deck, and in the bulkheads between compartments at the deckline, that the vessel could not be raised in that manner. Ultimately a derrick barge raised her with the use of slings. Some 50-odd rivets were found to be leaky after the raising. This was not caused by the salvage operation.

## Conclusions of Law

1. This court has jurisdiction over the subject matter of these actions. The libel in No. 2445 alleges the breach of a maritime contract of towage and also negligent towage, both of which are causes of action cognizable in admiralty.[1] Jurisdiction in admiralty extends to the libel in No. 2439, which arises out of a maritime contract of insurance,[2] and the court would be "required to measure [respondent's] liability by the standards of the maritime law even though the proceeding was instituted in a common-law court." [3]

2. "Under general maritime law, contracts of insurance must be enforced as written".[4] "The only question in such cases

1. Moran Towing & Transportation Co. v. Nav. Liberia Triestina, D.C.E.D.N.Y., 1936, A.M.C. 233; Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

2. De Lovio v. Boit, 1815, Fed.Cas.No.3,-776; The New England Mut. Marine Insurance Company v. Dunham, 1870, 11 Wall 1, 78 U.S. 1; Wilburn Boat Company v. Fireman's Fund Ins. Co., 5 Cir., 1953, 201 F.2d 833, 835; The Libbie [Robinson v. Home Ins. Co.], 5 Cir., 73 F.2d 3, 1934 A.M.C. 1557; Aetna Ins. Co.

v. Houston Oil & Transport Co., 5 Cir., 49 F.2d 121, 1931 A.M.C. 995.

3. Wilburn Boat Co. v. Fireman's Fund Ins. Co., supra note 2, 201 F.2d at page 835. See Carlisle Packing Co. v. Sandanger, 1922, 259 U.S. 255, 259, 42 S.Ct. 475, 66 L.Ed. 927; Chelentis v. Luckenbach S. S. Co., 1918, 247 U.S. 372, 384, 38 S.Ct. 501, 62 L.Ed. 1171; Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 243–245, 63 S.Ct. 246, 87 L.Ed. 239.

4. Wilburn Boat Co. v. Fireman's Fund Ins. Co., supra note 2, 201 F.2d at page 836, and cases cited.

is whether the thing warranted to be performed was or was not performed; * * *."[5]

3. Because of the breach of the warranty of the insurance contract as to seaworthiness, libelant cannot recover. Libelant failed to maintain the vessel in seaworthy condition in conformity with the warranty that during the continuance of the policy the vessel shall at all times be tight.[6] Had the deck plating and bulkheads been tight, water could not have entered the other compartments despite the flooding of the after rake tank. The ruptures and openings in the deck plating and bulkheads rendered the vessel unseaworthy to withstand such flooding. This unseaworthiness was the proximate cause of the sinking.

4. Libelant adduced no evidence to support the allegations of negligence contained in the libel in No. 2445. In the absence of proof of negligent towage, respondent Sam A. McDonald is free of any responsibility for the sinking of the Barge 105.

5. In action No. 2439, respondent, The Home Insurance Company, has not sustained the burden of proving negligent towage on the part of Sam A. McDonald or the Tug Virginia A.[7]

Decree in accordance herewith.

5. Home Ins. Co. v. Ciconett, 6 Cir., 1950, 179 F.2d 892, 894. To the same effect: The Texas No. 1, 5 Cir., 112 F.2d 541, 1940 A.M.C. 1106; The Libbie, supra note 2; Aetna Ins. Co. v. Houston Oil & Transport, supra note 2; Whealton Packing Co. v. Aetna Ins. Co., 4 Cir., 1911, 185 F. 108, 34 L.R.A.,N.S., 563; Fidelity-Phoenix Ins. Co. v. Chicago Title & Trust Co., 7 Cir., 12 F.2d 573; 1926 A.M.C. 787; United States Gypsum Co. v. Insurance Co. of North America, D.C. S.D.N.Y., 19 F.Supp. 767, 1937 A.M.C. 1247; Snyder v. Home Ins. Co., D.C.S. D.N.Y.1904, 133 F. 848; Jarvis Towing & Transp. Corp. v. Aetna Ins. Co., 298 N. Y. 280, 82 N.E.2d 577, 1949 A.M.C. 108. See also Norwich Union Indemnity Co. v. H. Kobacker & Sons Co., 6 Cir., 31 F. 2d 411, 87 A.L.R. 1069; Imperial Fire Ins. Co. v. Coos County, 1893, 151 U.S. 452, 14 S.Ct. 379, 38 L.Ed. 231.

6. Smith v. Northwestern Fire & Marine Ins. Co., 246 N.Y. 349, 1928 A.M.C. 174, 180–181, 159 N.E. 87.

7. Stevens v. The White City, supra note 1; The Lapwing, 5 Cir., 150 F.2d 214, 1945 A.M.C. 1076; Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309, 1952 A.M.C. 876.